UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


_____

GILBERTO PEREIRA BRITO, et al.,

                    Plaintiffs,          Civil Action
                                         No. 19-11314-PBS
V.
                                         November 5, 2019
WILLIAM BARR, et al.,                    9:37 a.m.

                    Defendants.
_____




TRANSCRIPT OF MOTION HEARING

BEFORE THE HONORABLE PATTI B. SARIS

UNITED STATES DISTRICT COURT

JOHN J. MOAKLEY U.S. COURTHOUSE

1 COURTHOUSE WAY

BOSTON, MA  02210




DEBRA M. JOYCE, RMR, CRR, FCRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5204
Boston, MA  02210
joycedebra@gmail.com

1    APPEARANCES:

2    FOR THE PLAINTIFFS:

3    MATHILDA McGEE-TUBB, ESQ.
     SUSAN M. FINEGAN, ESQ.
4    Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, PC
     One Financial Center, 42nd Floor
5    Boston, MA 02111
     617-348-4404
6
     DANIEL L. McFADDEN, ESQ.
7    MATTHEW SEGAL, ESQ.
     American Civil Liberties Union
8    211 Congress Street
     Boston, MA 02110
9    617-482-3170

10   FOR THE DEFENDANTS:

11   HUY LE, ESQ.
     United States Department of Justice
12   P.O. Box 868, Ben Franklin Station
     Washington, DC 20044
13   202-353-4028

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2                    (The following proceedings were held in open

3      court before the Honorable Patti B. Saris, United States

4      District Judge, United States District Court, District of

5      Massachusetts, at the John J. Moakley United States Courthouse,

6      1 Courthouse Way, Boston, Massachusetts, on November 5, 2019.)

7                    THE CLERK:  All rise.

8                    United States District Court is now in session.  Court

9      calls civil action 19-11314, Brito v. Barr, et al.

10                    Would counsel please state your name for the record.

11                    THE COURT:  You may be seated.

12                    Counsel should identify themselves now.

13                    MS. McGEE-TUBB:  Good morning, your Honor.  Mathilda

14      McGee-Tubb for the petitioners.

15                    THE COURT:  Slowly.

16                    Have you given the court reporter your name and

17      numbers?

18                    MS. McGEE-TUBB:  Yes.

19                    THE COURT:  All right.  So what's your name?

20                    MS. McGEE-TUBB:  Mathilda McGee-Tubb.

21                    THE COURT:  Okay.

22                    MR. McFADDEN:  Good morning, your Honor.  Daniel

23      McFadden on behalf of the ACLU of Massachusetts for the

24      petitioners.

25                    MR. SEGAL:  Good morning.  Matthew Segal for the

1    petitioners.

2              MS. FINEGAN:  Susan Finegan for the petitioners.

3              MR. LE:  Good morning, your Honor.  Huy Le for the

4    respondents.

5              THE COURT:  And you're from main Justice?

6              MR. LE:  Yes, ma'am.

7              THE COURT:  Thank you very much.  You may be seated.

8              I guess, what is this technically, it's a motion for

9    preliminary injunction or permanent injunction and a motion for

09:38 10   summary judgment?

11             MS. McGEE-TUBB:  That's correct.  It's a motion for

12   summary judgment or in the alternative for a permanent

13   injunction.

14             THE COURT:  All right, thank you.

15             Well -- all right, go ahead.

16             MS. McGEE-TUBB:  Thank you.

17             THE COURT:  You essentially asked for preliminary

18   injunction in the alternative.  I assume if I granted summary

19   judgment, you would want a permanent injunction, right.

09:38 20   MS. McGEE-TUBB:  Yes, yes, sorry, I misspoke.

21             THE COURT:  Go ahead.

22             MS. McGEE-TUBB:  Your Honor, Attorney McFadden and I

23   plan to divide the argument.  I'll address the merits, and then

24   Attorney McFadden will address the remedy, as well as we do

25   have a motion to modify the class definition.  You certified

1  the class as to Count I, which is the constitutional count, and

2  we --

3          THE COURT:  Who's taking that one?

4          MS. McGEE-TUBB:  Attorney McFadden will argue the

5  motion to modify.

6          THE COURT:  All right.

7          MS. McGEE-TUBB:  If you'd like to hear that now, we

8  can jump ahead, but I thought we'd start with the merits.

9          THE COURT:  Are you going to argue the APA claim?

09:39 10          MS. McGEE-TUBB:  Yes.

11          THE COURT:  It doesn't matter.  Do it whatever way

12  you've divided it.

13          MS. McGEE-TUBB:  Sure.  If at any point your Honor

14  would like to switch around, we're happy to change course.

15          So we're asking -- I'd like to start with sort of just

16  big picture why we're here and what we're asking for.

17          We're asking the Court to uphold the fundamental

18  principles of due process that are afforded to all of those

19  within our borders, including, without limitation, non-citizens

09:39 20  who are discretionarily detained pending removal proceedings

21  under 8 USC 1226(a).

22          As this Court knows from ample cases, both before this

23  Court and other courts, the government has systematically

24  deprived these individuals of their liberty without showing a

25  good reason for doing so.  This Court can end that

1    unconstitutional practice on a class-wide basis by directing

2    the parameters of a constitutionally adequate bond hearing for

3    non-citizens detained under 1226(a) moving forward.

4          In defining the parameters, this Court can prevent

5    class members from being unlawfully jailed and deprived of

6    their liberty without due process and, importantly, unjustly

7    separated from their families, their jobs, and their

8    livelihoods.  It can ensure that named -- that class members,

9    like the named class representative, Mr. Pereira Brito, who

09:40 10   financially supports his disabled wife and three children, who

11   are all U.S. citizens, are not taken from their families

12   without sufficient justification.

13         Mr. Brito was picked up by ICE and held for months on

14   what was ultimately a vacated removal order that was entered *in*

15   *absentia* because he didn't appear for a hearing that was

16   noticed for 1:30 in the morning.  The government voluntarily

17   released him after we filed this lawsuit.  Who knows for how

18   many more class members when challenged the government will

19   immediately concede that detention is unjustified.

09:41 20         So what we're asking the Court to do today is to

21   specify exactly what is required for a constitutionally

22   adequate bond hearing.  And we've set this out in our proposed

23   order, but to lay it out orally, a constitutionally adequate

24   bond hearing is one at which the government bears the burden of

25   justifying continued detention by proving by clear and

1  convincing evidence that the individual is a danger to others

2  or a flight risk, and even if she is, that no condition or

3  combination of conditions will reasonably assure her future

4  appearance and the safety of the community.

5  And finally, a constitutionally adequate bond hearing

6  requires that the immigration judge consider the individual's

7  ability to pay as well as -- in selecting the amount of bond

8  and considers the suitability for release on other conditions.

9  THE COURT:  Am I right that the statute requires a

09:42 10  certain amount of bond, like $1,500?

11  MS. McGEE-TUBB:  That's right.  That would be the

12  minimum amount.

13  THE COURT:  You're not challenging that?

14  MS. McGEE-TUBB:  No, we're not challenging that, but

15  we are asking that immigration judges be --

16  THE COURT:  So it's above 1,500 you're saying that the

17  judge should consider the ability to pay or are you challenging

18  the statutory amount?

19  Am I right?  When I was -- I've done, you know,

09:42 20  obviously several other due process cases, and I think there's

21  somewhere in the statute that says that $1,500 is the

22  presumptive amount.  I forget how it's exactly worded.

23  MS. McGEE-TUBB:  That's correct.  And our argument on

24  that point is only on constitutional grounds.  So our position

25  is that considering the ability to pay in setting the bond

1    amount is an important factor of the constitutional analysis,

2    but we're not asking that the Court override the -- or find

3    unconstitutional the minimum 1,500 for now.

4             THE COURT:  Thank you.

5             MS. McGEE-TUBB:  So I've set forth kind of the key

6    criteria --

7             THE COURT:  Let me ask you this.  How many District

8    Courts in the United States of America have at this point

9    addressed the issue and ruled that the burden should be on the

09:43 10   government?

11            MS. McGEE-TUBB:  Many, more than a dozen --

12            THE COURT:  I've done two or three anyway.

13            MS. McGEE-TUBB:  Yes.

14            THE COURT:  But other judges, other courts.

15            MS. McGEE-TUBB:  Yes, many.  So there are at least

16   four or five decisions out of the Southern District of New

17   York -- and this is specifically on the burden of proof.

18   There's a case, Darko v. Sessions from the Southern District of

19   New York, that collects many decisions that have ruled that,

09:43 20   Singh v. Holder in the 9th Circuit.  There was a 2nd Circuit

21   case --

22            THE COURT:  Excuse me.  Is the 9th Circuit still the

23   only circuit case?

24            MS. McGEE-TUBB:  There is a 2nd Circuit case, Lora,

25   that was vacated following Jennings.  Post-Jennings many

1   District Courts have continued to find <u>Lora</u> to be persuasive

2   and given it substantial weight, but as a technical matter,

3   that decision has been vacated.

4        THE COURT:  Thank you.  A better way of wording it.

5   After the <u>Jennings</u> case, the Supreme Court case, which left

6   open the constitutionality question, there's been no circuit

7   that's addressed the issue.  This will be the first, if it's

8   appealed, which I assume it may well be by one side or the

9   other, right?

09:44 10        MS. McGEE-TUBB:  Yes.  To the best of my knowledge,

11   there are no circuit decisions.  There are, as I mentioned,

12   many cases in the district courts, and I'm not certain of the

13   status of appeals of the those other decisions.  They're coming

14   out on a regular basis.  In fact, we did a search for new cases

15   following the closing of our briefing and we found at least 15

16   new cases that address this issue.  So --

17        THE COURT:  Have any held contrary to your position?

18   In other words, about -- that the burden of proof is consistent

19   with the due process clause?

09:45 20        MS. McGEE-TUBB:  Specifically for 1226(a) detainees

21   I'm not aware of any case that the burden of proof should be on

22   the non-citizen.

23        THE COURT:  As opposed to the criminal aliens and that

24   sort of thing.

25        MS. McGEE-TUBB:  Right, as opposed to 1226(c) or other

1   statutes under which people need to be detained.

2   THE COURT:  To the extent that you know, all the

3   District Court opinions -- and you say there's a plethora, you

4   don't have an exact number -- have held that the burden of

5   proof should be on the government in the due process analysis

6   but there's no post-Jennings circuit law on the point.

7   MS. McGEE-TUBB:  That's correct, to the best of my

8   knowledge.

9   THE COURT:  I know it keeps changing, and I haven't

09:45 10   actually written an opinion on it, on 1226(a), in a while; I

11   just didn't know if the terrain had changed.

12   MS. McGEE-TUBB:  Sure.  And we would be happy to

13   submit a notice of supplemental authority that collects the

14   cases for your Honor.

15   THE COURT:  That would be -- yes, that would be

16   important.

17   MS. McGEE-TUBB:  Absolutely.

18   THE COURT:  Both ways, that go both ways if you find

19   any.

09:46 20   MS. McGEE-TUBB:  Of course, we will --

21   THE COURT:  Because -- I don't want to interrupt your

22   sequence -- I've already ruled on this issue, and the only

23   issue is whether -- who bears the burden of proof on this, and

24   I didn't know whether there was Circuit or new case law that I

25   should consider in my analysis for the class.  And you're

1    saying, no, it's been pretty consistent; is that it?

2          MS. McGEE-TUBB:  Correct.  So the consensus nationwide

3    is that the burden of proof should be on the government in

4    1226(a) bond redetermination hearings.

5          THE COURT:  So now let's move on to the other things

6    that you're asking for, which is the burden of proof, i.e.,

7    whether it should be preponderance or clear and convincing and

8    the combination of conditions of release and the looking at the

9    capability of the person for affording it.  I think I've ruled

09:47 10   on a few of those things, but I would like to know sort of

11   where the case law has gone on that.  Because I have rejected

12   the position that clear and convincing should apply to at least

13   flight risk.  So I'm just curious as to what other smart people

14   across the country have done on that issue.

15         MS. McGEE-TUBB:  Yes.  So as you have previewed, many

16   courts across the country have addressed the standard of proof

17   in 1226(a) hearings, and the vast majority of the cases apply

18   the clear and convincing evidence standard to both flight risk

19   and dangerousness.  In fact, one decision out of the District

09:47 20   of Colorado in a case called Diaz-Ceja referred to your

21   decision in Pensamiento as an outlier and --

22         THE COURT:  On the burden.

23         MS. McGEE-TUBB:  On the standard of proof, yes, on

24   whether it should be --

25         THE COURT:  So he did clear and convincing for flight

1  risk and dangerousness?

2      MS. McGEE-TUBB:  So that court and that judge,

3  District of Colorado, actually did bifurcate the standard for

4  dangerousness and flight risk.  And that decision is the only

5  other decision that we could find besides your decision in

6  Pensamiento that split the standard in that way.

7      THE COURT:  I actually did rule on it subsequently.

8      MS. McGEE-TUBB:  You did in Reid, yes.

9      THE COURT:  But it was a different statutory section.

09:48 10      MS. McGEE-TUBB:  Yes.

11      THE COURT:  But I'm most curious about your continued

12  pressing the point that clear and convincing should apply to

13  flight risk since we don't even do that on the criminal side.

14  So why should I draw the distinction?  In other words, the

15  government only has to prove by a preponderance in a

16  run-of-the-mill criminal case that someone has to -- might be a

17  flight risk.

18      MS. McGEE-TUBB:  So it's a great point, and the reason

19  that we're asking for the clear and convincing evidence

09:49 20  standard is rooted in the due process analysis in cases like

21  Addington and Foucha, and in those cases, the Supreme Court

22  talked about the allocation of risk and minimizing the risk of

23  error.

24      THE COURT:  Which case?

25      MS. McGEE-TUBB:  Addington --

1          THE COURT:  All right.

2          MS. McGEE-TUBB:  -- and Foucha.  Yes, the cases about

3     civil commitment.

4          THE COURT:  Yes.

5          MS. McGEE-TUBB:  So, in those case, particularly

6     Addington, the Supreme Court emphasized that the risk of error

7     should not be shared equally where there is a substantial

8     fundamental liberty interest at stake.

9          Addington --

09:49 10          THE COURT:  Did Addington address flight risk?

11          MS. McGEE-TUBB:  No.  But I think the framework is

12     important, and I understand your question, and if you don't

13     mind, I'll lay out the framework and then I'll come -- I'll

14     definitely address the flight risk part of it.

15          Addington talked about a spectrum and on the one hand

16     are these civil cases that have monetary disputes and those get

17     a preponderance standard.  On the other end of the spectrum are

18     criminal cases where the risk to the individual is so

19     substantial that the standard of proof is beyond a reasonable

09:50 20     doubt.

21          We're somewhere in the middle because we're talking

22     about civil confinement.  So in all cases that we have been

23     able to find on the general civil commitment side, the standard

24     is clear and convincing evidence.  So why should that apply to

25     flight risk when in the -- you're saying in the Bail Reform Act

1    we don't apply a clear and convincing standard, we apply a

2    preponderance standard.  Our position here, and it's consistent

3    with what the vast majority of the courts to consider this

4    issue have taken, is that 1226(a) detainees are unlike 1226(c)

5    detainees, which is what you addressed in Reid, and they're, to

6    some extent, unlike pretrial criminal detainees who are subject

7    to the Bail Reform Act.  The Bail Reform Act applies to people

8    who are awaiting trial who are charged with serious crimes or

9    have a history of criminal convictions, and there is a very

09:51 10   substantial government interest in assuring that those people

11   appear for trial.  And particularly in the criminal context,

12   the trial cannot move forward without that individual present.

13            THE COURT:  Let me ask you this.  Congress at some

14   point, I think the government cited this, in passing IRAIRA the

15   1996 statute, said something along the lines of Congressional

16   concern that -- there were some extraordinarily high

17   statistics, something like 90 percent of the people who were

18   captured, if you will, who were unlawfully here then fled and

19   didn't appear for their removal proceedings.  How do I deal

09:51 20   with that statistic?

21            MS. McGEE-TUBB:  So that data -- I'm not sure if this

22   is exactly --

23            THE COURT:  Maybe I quoted it wrong, but something

24   along those lines.

25            MS. McGEE-TUBB:  So I don't have the exact statistics

1  in front of me, but I believe that what you're referring to is

2  from the Congressional reports at the time that this statutory

3  scheme was enacted.  And those Congressional reports really

4  contemplated 1226(c), which was specifically tailored to

5  non-citizens who have criminal convictions.

6      THE COURT:  So you would say that quote, the 90

7  percent statistic quote, only involved criminal aliens?

8      If you don't know, that's fine.

9      My father always used to say, If you don't know, just

09:52 10  say I don't know, you can let me know.

11      MS. McGEE-TUBB:  I don't have that particular

12  statistic in front of me, so I don't know what the source was,

13  but most of these Congressional reports are drawn from Demore,

14  which is the Supreme Court case that discussed these reports,

15  and those -- all of the quotes from the reports in the Demore

16  case pertain to this concept of criminal aliens who were afraid

17  that they were going to run away and commit more crimes.

18  That's how Demore characterized this limited category of

19  people.

09:53 20      THE COURT:  Can I just turn to the government for one

21  minute?  You may have this whole legislative history memorized.

22  Do you know, when they were talking about that 90 percent rate,

23  were they talking about aliens or just people with criminal

24  convictions?

25      MR. LE:  Your Honor, I don't have that statistic off

1    the top of my head.

2            THE COURT:  Okay.  We'll find out later.  That's good.

3            MS. McGEE-TUBB:  And we can certainly look into that.

4            THE COURT:  I'll let you go.

5            MS. McGEE-TUBB:  Just remembering where I left off

6    with that point.

7            So we were talking about how the pretrial detainees

8    under the Bail Reform Act, the goal is to ensure that they are

9    there for the criminal trial so that it can proceed.  The

09:54 10   important distinction between pretrial detainees and 1226(a)

11   detainees is if somebody is released and they don't show up for

12   their removal proceedings, removal can be ordered against them

13   *in absentia*.  So there's not an incentive to flee in that

14   sense.  It's meaningfully different than the pretrial criminal

15   detainees where the trial cannot proceed without them.

16           So when you consider that, I think there's a very

17   valid reason to modify from what we see in the Bail Reform Act

18   context and apply the clear and convincing evidence standard to

19   the flight risk component.

09:54 20           THE COURT:  Why don't we move on, simply because I

21   have an 11:00 plea, so I want to make sure everyone gets

22   through all their points and the government has a fair

23   opportunity here.

24           MS. McGEE-TUBB:  Absolutely.

25           On the next piece, which is conditions of release and

1    ability to pay, your Honor has already acknowledged that these

2    are necessary considerations in Reid.  So if those conditions

3    apply in the 1226(c) context, they should apply in the 1226(a)

4    context as well.  Unless your Honor has any questions about

5    what we're asking for there, I will move on.

6         THE COURT:  The one question I have when I'm doing a

7    class-wide basis is we do GPS a lot on the federal level.  In

8    fact, I think when I was a magistrate judge I may have been the

9    first one in the country to use them; they're very effective.

09:55 10   That said, it takes a whole Probation Office to monitor.  In

11   other words, it's only effective because you have somebody

12   checking in on them and monitoring if the beep goes off and

13   that sort of thing.

14        Do you know on a resource level if I impose this on

15   the whole I guess this region, I suppose, is where the

16   jurisdiction is, is there a resource issue here?

17        Does ICE already do it?

18        (Discussion off the record.)

19        MS. McGEE-TUBB:  If you don't mind, I think I'll have

09:56 20   my colleague, Attorney McFadden, answer the question just

21   because he has a lot more information, particularly on what the

22   government currently --

23        THE COURT:  I'll wait until I get to him.

24        All right.  Other than the resource issue, you want me

25   to impose you've got to have other considerations that they

consider, like combination of cash bail plus GPS monitoring or
maybe securing it with a home or the things we look at in the
criminal context.

MS. McGEE-TUBB:  A variety of conditions, yes.  We've
submitted a proposed order that contains specifically the
language that we hope the Court will enter, and it's that no
condition or combination of conditions will reasonably assure
the detainee's future appearance and the safety of the
community.

09:56 10        I would just add, Attorney McFadden will address the
resources issues, but what we're talking about is what is
constitutionally required.  Your Honor wouldn't be ordering the
immigration judges to necessarily use GPS monitoring for
everybody, but if something is constitutionally required, there
will need to be some way to figure out the resources to achieve
that.  So I just want to bring it back to interests we're
talking about.

THE COURT:  Thank you.

MS. McGEE-TUBB:  I'm happy to address the statutory
09:57 20 argument.  I know we're tight on time --

THE COURT:  The big issue -- are you doing the APA?

MS. McGEE-TUBB:  Yes.

THE COURT:  I've already ruled on due process and I'm
not likely to change my mind, although I may word it slightly
different, I've evolved over the last year a little bit.  But

 1    why should I engage -- I don't even understand the APA claim.

 2    So let me just say, has any court in the country ruled that you

 3    review a Board of Immigration Appeals decision, it's

 4    essentially a court decision in the immigration court system,

 5    under the Administrative Procedure Act?

 6           MS. McGEE-TUBB:  I'm not sure that I can answer that

 7    question on a broad level.  I'm not aware of a decision that

 8    has grappled specifically with the argument that we've

 9    presented here, that the BIA decision in Adeniji is an

09:58 10   arbitrary and capricious decision.

11           THE COURT:  How about any -- I understand the Board of

12    Immigration Appeals is reviewed by the Circuit Court in

13    general.  It's not something I do in District Court.  I believe

14    the appeals go directly to the Circuit.  And so if something

15    that the BIA says is arbitrary and capricious, that typically

16    would go to the Circuit.  So I can't even figure out how I

17    would review a case holding of the Bureau of Immigration

18    Appeals.  And you said, Well, maybe we need to gather an

19    administrative record.  There's a little tiny footnote in font

09:59 20   I could barely read, that said maybe you need an administrative

21    record.  I don't even know what that would look like.  Is that

22    the case record or just --  I was completely unclear and

23    without precedent as to how I would review that.

24           MS. McGEE-TUBB:  So we're not necessarily asking your

25    Honor to overturn a BIA decision, but we are asking your Honor

1  to consider the policy or the framework that the BIA has

2  articulated and adopted throughout its decisions and to say

3  that that approach violates the APA because both its -- it

4  violates a constitutional right --

5      THE COURT:  Well, that's automatically under the APA,

6  but you're looking for more than that.  You want a record

7  review.

8      MS. McGEE-TUBB:  I'm not sure that we were asking for

9  a record review.

10:00 10      THE COURT:  It looked as if you were looking at two

11  different prongs of the Administrative Procedure Act, one of

12  which is of course correct, which is an agency can't consider

13  the constitutionality of its own actions.  So if I found a

14  violation of due process I think would automatically bootstrap

15  that argument.  But you were looking for more than that I think

16  on whether or not -- maybe I misunderstood it -- whether or not

17  the -- by flip-flopping back in the -- when was it, the mid

18  '90s?

19      MS. McGEE-TUBB:  1999.

10:00 20      THE COURT:  1999, okay.  By flip-flopping on the

21  burden of proof and the Bureau of Immigration Appeals somehow

22  procedurally seemed to have been arbitrary and capricious

23  without giving good reasons for changing its standard.

24      MS. McGEE-TUBB:  Yes.  So that's the genesis.  But the

25  BIA has consistently applied this -- the burden of proof on the

non-citizen.  So we are making the argument that under the APA,

the approach of applying the burden of proof to the non-citizen

is arbitrary and capricious because it -- its genesis was in an

unexplained departure from prior precedent.  So that's correct

that we're making that argument.  I'm not sure that --

THE COURT:  What does it add?

MS. McGEE-TUBB:  What does it add?

THE COURT:  Yeah, other than it's a great law school

exam question, I mean, does it add anything to the bottom line

on how I think about the case?  Because if you win, what do you

get, if you win the flip-flop argument?

MS. McGEE-TUBB:  So it is another way of considering

the same issue and specifically the question of the burden of

proof.  Our APA argument doesn't address the other issues that

we've talked about today.

THE COURT:  So is it an alternative argument if I

don't find there's a Constitution -- is that sort of where

we're at?

MS. McGEE-TUBB:  It's an alternative argument, yes.

THE COURT:  Do I need to address it?

MS. McGEE-TUBB:  You don't need to address it to grant

the relief that we're seeking.

I think it's quite likely that at some point, whether

it's the 1st Circuit in this case or another Circuit Court, is

going to take up the statutory -- the statutory argument,

```
 1    and --

 2              THE COURT:  But the pure statutory argument I believe

 3    the Supreme Court's already addressed in Jennings.

 4              MS. McGEE-TUBB:  Yes.

 5              THE COURT:  So pure statutory -- so the only issue --

 6    excuse me if I'm thinking about this incorrectly.  So the pure

 7    statutory argument is out the window because the Supreme Court

 8    has rejected it.  The pure issue is whether or not the Board of

 9    Immigration Appeals, which is like an agency appellant entity,

10:02 10  whether they somehow violated the Administrative Procedure Act

11    when they changed their mind on the burden, and it's just a

12    novel argument.

13              MS. McGEE-TUBB:  Yes.  And when I say "statutory," I

14    meant our APA argument and the APA being the statute.  So --

15              THE COURT:  Okay, well, thank you.

16              MS. McGEE-TUBB:  So unless your Honor has any further

17    questions, I'll turn it over to Attorney McFadden to address

18    the specific relief that we're seeking.

19              THE COURT:  Thank you very much.

10:03 20          MR. McFADDEN:  Good morning, your Honor.

21              I think just before beginning I could address a couple

22    of the questions I think you had that were specific to the

23    practice of ICE.

24              THE COURT:  Yes.

25              MR. McFADDEN:  Specifically if they had the ability to
```

1   do GPS.  The answer to that is yes.  ICE does administer GPS to

2   people to who it releases.  In fact, Mr. Pereira Brito in this

3   case was monitored with GPS after his release.

4           THE COURT:  So they do have a protocol.

5           MR. McFADDEN:  Yes, your Honor, they have a protocol

6   in place for monitoring.

7           THE COURT:  I don't know if the number is 90 percent

8   or not, but there is a legitimate concern that somebody who

9   wants to stay in this country won't report in.

10:03  10          MR. McFADDEN:  So I think, your Honor, the statutory

11  history you're mentioning with respect to the percentage might

12  be from Demore.

13          THE COURT:  Yes.

14          MR. McFADDEN:  In the dissent of Demore, it says that

15  92 percent of criminal aliens, most of whom were LPRs who were

16  released under supervisory conditions, attended all of their

17  hearings.  So I think that's a meaningful statistic from

18  Demore.

19          THE COURT:  So what was the 90 percent statistic?

10:04  20          MR. McFADDEN:  Your Honor, I'm not sure.  There is a

21  statistic in the majority opinion of Demore that says that a

22  little over 20 percent of 1226(c) detainees fail to appear for

23  their removal hearings.

24          THE COURT:  Did I make up the 90 percent?  I think I

25  saw it somewhere.

1    You quoted it, right?

2    MR. LE:  Not in this case, your Honor.  I don't think

3    so.

4    THE COURT:  All right.  Maybe it's a fragment of my

5    imagination.

6    All right.  Go ahead.

7    MR. McFADDEN:  Your Honor, I think that before getting

8    to relief, if I could just briefly address the motion to modify

9    the class.

10:04 10    We had moved to add Count II, the statutory challenge,

11    into the class definition.  The Court has authority to do that

12    under Rule 23(c)(1)(C), and we submit that all of the

13    requirements for certification as to that count are satisfied.

14    The government has admitted numerosity, that is not a contested

15    issue.  And the Court has already found that all the other

16    requirements of Rule 23 are satisfied for challenges to the

17    legal standard for who bears the burden at an immigration bond

18    hearing.

19    The government has responded to our motion to modify

10:05 20    the class definition by arguing that Count II should fail on

21    the merits, but that in and of itself should not be a reason to

22    deny certification.  And there's certainly no prejudice to the

23    government here.  The issue has been completely briefed,

24    there's been no request for any discovery regarding Count II.

25    So we suggest there's no --

1          THE COURT:  Why would I do it?  What does it add?

2          MR. McFADDEN:  So, your Honor, Count II --

3          THE COURT:  And it will slow me down to try and figure

4     it out.

5          MR. McFADDEN:  I understand, your Honor.

6          Count II is somewhat narrower than Count I.  Count II

7     addresses the allegation of the burden of proof.  It does not

8     necessarily address issues relating to, for example, conditions

9     of release or consideration of ability to pay, so it is a

10:06 10   somewhat narrower count.  If the matter were appealed, Count II

11    might provide an alternative basis for part of the judgment to

12    be affirmed.

13         THE COURT:  I was just confused, maybe you can

14    remember some cases where in District Court a ruling, a holding

15    of the BIA was challenged on APA grounds.

16         MR. McFADDEN:  I don't have that in front of me, your

17    Honor, in part because I don't believe the government has

18    contested that the APA applied.  In fact, the government argued

19    Chevron principles in their opposition.

10:06 20         THE COURT:  I'll ask him that.  How would I even think

21    about a record in that case?

22         MR. McFADDEN:  I think, your Honor, the question in

23    that case is did the BIA articulate in the Adeniji decision in

24    1999 an adequate basis for departing from its prior precedence?

25    So I think what we've asked the Court to do is look at what did

the BIA say in the actual decision and was adequately justified in departing from the prior practice, not an underlying administrative --

THE COURT:  This is what's confusing me.  I've never -- I've been a judge a long time, so when I've never done something, it's significant, 25 years here.

No one's ever asked me or the District Court, to my knowledge, to review a BIA holding, and that's because jurisdiction typically rests with the 1st Circuit.  So I'm just trying to figure out what -- does this open up essentially all BIA decisions to an APA review in District Court?

MR. McFADDEN:  I think, you know, what we're asking here, your Honor, is review of a BIA decision that set practice for, you know, essentially a rule-making type of activity.

THE COURT:  So it's a carveout when there's a policy shift, as opposed to whether or not somebody is really a refugee or something like that.

MR. McFADDEN:  We certainly have not asked for review of the individual facts of any particular case, your Honor. We're asking that this be addressed as a question of precedent that ultimately set a policy for how the BIA and the immigration courts addressed questions of detentions.

THE COURT:  I do know one of my colleagues rejected an APA, but it was sort of in a footnote.  But I don't think it had a huge amount of analysis and was noted kind of thing.  So

 1  no court's addressed it, is that fair, other than that

 2  footnote?

 3          MR. McFADDEN:  To my knowledge, your Honor, I think

 4  that is correct.  You know, what I would suggest, your Honor,

 5  one option could be if the Court feels it needs additional time

 6  to consider this claim, it could decide Count I and then sever

 7  off all or some of the Count I decision to a final judgment and

 8  then could take additional time, for example, if the Court

 9  wanted additional briefing on Count II, that could also be an

10:08 10  option.

11          THE COURT:  Okay.

12          MR. McFADDEN:  In terms of the relief that we're

13  requesting, your Honor, we've asked the Court for two forms of

14  relief, a declaration and an injunction.  The Court has already

15  indicated in its class certification order, similar to in Reid,

16  that it has the jurisdiction to enter a declaration, in part

17  because six justices of the Supreme Court, three in Preap and

18  three in Jennings, agreed that the jurisdictional limitation

19  asserted by the government 1252(f)(1) does not apply to

10:09 20  declaratory relief.

21          And as to the injunction, the Court has already ruled

22  that it has jurisdiction to enter the injunction because that

23  same limitation would only apply if the injunction obstructed

24  the operation of a provision of the statute.  And as this Court

25  has noted, 1226(a) is silent on procedures for bond, and that

1    is what we're asking the Court to enter an injunction

2    regarding.

3              THE COURT:  I know Hamama touched on the subject, have

4    there been any other circuits that have?

5              MR. McFADDEN:  Not to my knowledge standing here, your

6    Honor.  We could look at that and get back to you.

7              THE COURT:  That's a difficult statutory issue for

8    sure other courts will look at.

9              MR. McFADDEN:  Yes, your Honor.

10:09 10          THE COURT:  I'm pretty convinced on the declaratory

11   judgment piece of it.  The injunction piece I think I've

12   already ruled on, but I didn't know if there was a case that

13   would make me change my mind.  To your knowledge, there is

14   none?  I knew about Hamama.

15             MR. McFADDEN:  To my knowledge, there's not a Circuit

16   case.

17             THE COURT:  Am I saying that right?

18             MR. McFADDEN:  I think you are, your Honor.  I don't

19   necessarily have superior knowledge on that.

10:10 20          But to my knowledge, your Honor, there's not a Circuit

21   case, but we can look and we can submit any authorities if that

22   would be helpful on the injunctive jurisdiction piece, if that

23   would be helpful.

24             THE COURT:  All right, go ahead.

25             MR. McFADDEN:  The request for the declaration, your

1    Honor, would be for a declaration that memorializes the

2    procedures for the bond hearing that this Court has

3    articulated: the burden being on the government; a standard of

4    proof; a requirement to consider conditions of release which is

5    consistent with the statute that authorizes release on

6    conditional parole; and also a requirement for consideration of

7    ability to pay if a bond is selected, which is also consistent

8    with the statute.

9         So we've asked that that declaration enter, that would

10:11 10   provided a basis for prospective application of those

11   principles.

12        THE COURT:  Prospective is fairly easy; it's

13   retrospective that's more of a challenge.

14        MR. McFADDEN:  That's right, your Honor.  And we have

15   worked hard to try to fashion a proposed injunction that I

16   think is effective at providing retrospective relief.  Also, it

17   applies to all of the class members in both the prehearing and

18   post-hearing class, so conceivably those classes could be

19   addressed together maybe with the post-hearing class as a

10:11 20   subclass.

21        But the injunction that we've proposed would not

22   itself order the release of any detainee, and the injunction

23   would not itself contravene any provision of the statute.

24   Instead, it would first set forth that when any class member

25   has a bond hearing in the future for any reason, that the

1    protections in the declaration will be applied at that hearing.

2    So that could be a prehearing class member who is arrested and

3    has that person's first hearing, that could be a post-hearing

4    class member who's had a change of circumstances and becomes

5    entitled to another hearing for that reason, and that could

6    also be a post-hearing class member who suffered prejudice.

7         And that's the second part of the injunction we're

8    asking for, that any post-hearing class member who suffered

9    prejudice as a result of the procedural errors in the initial

10:12 10  hearing would get a new hearing where "prejudice" is defined as

11   this Court has defined it, the result could have been different

12   if the correct procedures had been applied.

13        And then the third part of the injunction is an

14   initial procedural mechanism for starting to sort out who has

15   suffered prejudice in the post-hearing class.  So what we have

16   suggested is that the government should identify to us the

17   members of the class, including where are they detained, do

18   they have counsel, that kind of thing, their names, of course

19   their A number.

10:12 20       Second, the government should take a position --

21        THE COURT:  If I order the production of the names of

22   the people who are incarcerated, is that something that's

23   confidential or in the public record?

24        MR. McFADDEN:  What I would suggest, your Honor, and

25   what we've proposed in our suggested order would be that there

1    be a protective order in place.  We would get -- as class

2    counsel we would get --

3         THE COURT:  The name, the location, and perhaps the

4    length of detention.

5         MR. McFADDEN:  Yes, your Honor.  In our order we laid

6    out a list of --

7         THE COURT:  I know, but you go too far.  If I'm going

8    to -- that's okay, but you ask the government to sort of

9    determine prejudice.  I think -- and then whether or not

10:13 10   they're contesting it or not.  That could take a year.  What

11   did you say, there may be 700 people?

12        MR. McFADDEN:  Well, your Honor, we looked at a

13   six-month period and found in that period about 250 people had

14   been denied bond, had got a no-bond order who were class

15   members.  So the numbers don't seem to be too big.  And then

16   we're talking about --

17        THE COURT:  Why not just give them a notice, say

18   here's the decision, here are some lawyers, if you want to file

19   a habeas -- this is what we do in federal court -- file a

10:14 20   *habeas* petition if you think that you could have been

21   prejudiced.

22        MR. McFADDEN:  Yes, your Honor, I have a few points to

23   make on that question.

24        THE COURT:  And not all coming here.  So just randomly

25   drawn.

1          MR. McFADDEN:  I understand, your Honor.

2          A couple of points on that.  I mean, first of all,

3     it's important to recognize it is a very heavy burden to ask a

4     detained non-citizen to file a *habeas* petition.  I point out

5     this Court decided Pensamiento about a year and a half ago.

6     Since that time, probably over 500 detainees in this class have

7     had bond hearings and have been denied bond.  So you could

8     have, in theory, had 500 meritorious habeas petitions during

9     that time.  Certainly the number has been much smaller, I think

10:14 10    reflecting the obstacles that people face trying to come and

11    file a federal lawsuit.

12          The second point I would make is I think that it makes

13    sense for us to confer because this should not be a

14    particularly difficult decision for the government, I think.

15          The standard for prejudice is just the result could

16    have been different.  So almost everyone will have suffered

17    prejudice, and it is not an overwhelming administrative burden

18    for the government to go through and make those determinations,

19    especially where the government already has in its

10:15 20    possession --

21          THE COURT:  I found the government, although I don't

22    always agree with them, once they came here, I would say over

23    half of them have been resolved with release.  So, I mean,

24    coming here is a way to focus -- not me personally, but to the

25    federal court.  I don't know the exact numbers, but the

1    government has released many people when there's a *habeas*

2    challenge.  So I'm just not sure your system is faster or --

3          MR. McFADDEN:  I think, your Honor, it's just like

4    when we file motions in federal court where we confer in

5    advance to try to narrow the issues to prevent a burden on the

6    court.  Under Local Rule 7.1 and Local Rule 37.1, I think it

7    would be a very similar system where the government would just

8    tell us -- it doesn't have to concede prejudice, it doesn't

9    have to prove prejudice -- but just tell us for these class

10:16  10    members is it going to contest prejudice?  And the government

11    has all the information.  The government has the bond hearing

12    record, the recording, the DHS trial attorney who was at the

13    bond hearing works for the government.  The government has the

14    A-File, the complete immigration court file.  So all that

15    information resides with the government, not with the

16    individual class members or with class counsel.  So I think

17    it's appropriate for the government to begin the process.

18          The other thing I'd mention, your Honor, the reason we

19    have essentially a backlog of people who will be entitled to a

10:16  20    new hearing is that the government elected to continue the

21    practice of providing these deficient bond hearings after it

22    was told by this Court in <u>Pensamiento</u> --

23          THE COURT:  But I'm only one judge.

24          MR. McFADDEN:  I understand.

25          THE COURT:  What can I say?  I do think the position I

1   took is consistent with what's happening across the United

2   States of America, but still, there's no requirement that they

3   follow it.

4        MR. McFADDEN:  Your Honor, and I'm not asking for

5   moral judgment on the government.  What I am suggesting is the

6   government knew after <u>Pensamiento</u> especially, and especially as

7   more authorities have accumulated, it knew that these bond

8   hearings it was providing were likely to require some type of

9   correction down the road, and it made a decision not to appeal

10:17 10   <u>Pensamiento</u> and try to prevail there.  They made a decision not

11   to do any rule making to modify its practices.  The Attorney

12   General has recently been taking quite a few BIA cases *sua*

13   *sponte* in order to issue decisions.  The Attorney General could

14   have taken the case and switched the burden if he wished, that

15   didn't happen.

16        THE COURT:  The Attorney General is doing what?

17        MR. McFADDEN:  The Attorney General has asserted the

18   authority to take for himself BIA decisions and issue different

19   decisions.

10:17 20        THE COURT:  Really?

21        MR. McFADDEN:  Yes, your Honor.  That's happened

22   several times, a number of times in the last two years.

23        THE COURT:  On bail?

24        MR. McFADDEN:  No, not bond related, your Honor,

25   substantive questions about immigration law.

       1              I guess what I'm saying is, there were avenues for the

       2     government to modify its practice, and they just chose not to

       3     do that.  In fact, I would suggest that most of the people who

       4     are now post-hearing class members who would be entitled to

       5     some potential type of relief, those are people who have

       6     probably been arrested in many cases since this class action

       7     began.  And again, the government could have provided some type

       8     of alternative process.  I think the government assumed the

       9     risk that if it didn't prevail, it would have at least some

10:18 10     obligation help correct the problem that it created.  So I

      11     think it would be appropriate and equitable for the government

      12     to bear some of the burden of trying to correct this issue.

      13              Just a couple of other points that I would make, your

      14     Honor.  The government has asserted that issuing an injunction

      15     would violate Congressional intent.  As to that, what I would

      16     say is, first, the text does not express any Congressional

      17     intent that these class members bear any burden of proof

      18     whatsoever.  The government probably is pointing to some

      19     alleged unexpressed intent of Congress, but the government was

10:18 20     the one that went all the way to the Supreme Court in Jennings

      21     to get a ruling that 1226 says only what the words say and

      22     nothing more.  So I don't think the government can equitably

      23     assert now that the Court should try to guess at an unexpressed

      24     intent.

      25              THE COURT:  But isn't there a doctrine that if

 1    Congress is silent, that the agency can fill in the gaps?

 2              MR. McFADDEN:  Well, I think --

 3              THE COURT:  That it's entitled to some deference under

 4    Chevron.

 5              MR. McFADDEN:  I think, your Honor, that's a little

 6    different than the Congressional intent point the government

 7    has been trying to make.  Here --

 8              THE COURT:  I think the quote is, Under Chevron, when

 9    a statute is silent or ambiguous with respect to the specific

10:19 10   issue -- here they're silent on bail for 1226(a) -- the Court

11    may ask only whether the agency's answer is based on a

12    permissible construction of the statute.

13              MR. McFADDEN:  That's correct.  So Chevron, your

14    Honor, allows the agency some type of construction of an

15    ambiguous statute but only within the confines of the

16    Constitution and other laws.  So here, Chevron would not permit

17    the government to continue to put the burden --

18              THE COURT:  For constitutional reasons.

19              MR. McFADDEN:  Correct, your Honor.  Chevron doesn't

10:20 20   permit the government to go outside of the Constitution.

21              The other thing I'd say, your Honor, is that, if

22    anything, I would suggest the Congressional intent favors the

23    petitioners.  1226(a) was passed in 1996.  At that time the

24    burden was on the government in bond hearings under Patel, and

25    if Congress had wanted to express disapproval of that and put

1    the burden onto the non-citizen, it could have done that.

2    Instead, Congress adopted essentially the same language that

3    was already in place in the predecessor statute, and it wasn't

4    until 1999 that the BIA switched the burden.  So, if anything,

5    Congress could be suggested to have most likely thought that

6    1226(a) would continue as it had continued at the time.

7         The last point I would make, your Honor, is that I

8    know that there has been some discussion of appeal and I know

9    that I think that both parties in this case probably have some

10   interest in allowing this case to move up to appeal

11   expeditiously.

12        THE COURT:  Sure.

13        MR. McFADDEN:  There are individual cases that are

14   already on appeal.  The Doe case, the appellee's brief, I

15   believe, is due next month.

16        So I would just mention to your Honor that if it looks

17   like more time might be required in order to resolve some of

18   these issues, then I think it might be beneficial to sever off

19   at least the declaration and allow an appeal potentially to

20   proceed on that if the Court needs more time.  And the reason I

21   say that is once --

22        THE COURT:  You want me to stay this case pending Doe,

23   is that it?

24        MR. McFADDEN:  No, your Honor.  The Court, under Rule

25   54(b), could sever off -- if there was some additional work to

1   be done the Court felt on any of the issues --

2          THE COURT:  I see.  So, like, I could move on the due

3   process and just stay the APA.

4          MR. McFADDEN:  If that was the Court's --

5          THE COURT:  For the Administrative Procedure Act.  All

6   right, thank you.

7          MR. McFADDEN:  Yes, your Honor.  The reason I say

8   that, your Honor, is once the numbers come in, it may be that

9   we would suggest a status conference, numbers of people where

10:21 10  prejudice is disputed, we would probably ask for a status

11  conference, and if the numbers are significant, we might ask

12  for further enforcement as to the injunctive part.

13         THE COURT:  Thank you.  I need to give the government

14  a chance here.  Thank you very much.

15         You're up at bat.

16         MR. LE:  Thank you, your Honor.  So if the Court would

17  allow, the government would like to at least address the due

18  process issue for the purposes of making a record.

19         THE COURT:  Sure.

10:22 20  MR. LE:  The government understands your Honor's

21  position on the issue, however, it's important to note that the

22  relief that the petitioners are requesting today is exactly

23  what the government has been maintaining from the very

24  beginning, that individualized treatment that they've requested

25  is exactly why class action isn't appropriate for their due

     1    process claim.

     2          The government has maintained from the beginning that

     3    a threshold determination --

     4          THE COURT:  This is on the retrospective relief.

     5          MR. LE:  Yes.

     6          THE COURT:  Not prospective, prospective is where the

     7    burden lays and what the standard is.

     8          MR. LE:  Well, your Honor, for -- in order to even get

     9    there, the threshold determination for a constitutional

10:23 10   prejudicial injury, those are fact and circumstance specific

     11   analysis, and that's exactly why class action judgment wouldn't

     12   be proper here.  And the 1st Circuit has held that it's a

     13   threshold determination.  Your Honor, this Court, has held that

     14   that's something that petitioners would need to prove in a

     15   *habeas* petition challenging due process.

     16         THE COURT:  Prejudice, for the ones who are already --

     17         MR. LE:  Correct, your Honor.

     18         THE COURT:  If you could just be clear on -- there's

     19   two classes, there's one who have not yet had the hearing and

10:23 20   those who have already had a hearing.

     21         MR. LE:  That's right, that's right, your Honor.

     22         THE COURT:  Do you have an estimate of how many people

     23   we're talking about who are sitting in jail right now who are

     24   awaiting hearing?

     25         MR. LE:  Not an exact number, your Honor.  I had asked

 1    UIR to do a quick query, and they -- just based on the short

 2    time frame and everything else that's going on, they based

 3    their numbers on I believe what petitioners had cited before,

 4    which was right around 700 or so.

 5          THE COURT:  Seven hundred are awaiting hearing.

 6          MR. LE:  Who had bond hearings previously.

 7          THE COURT:  Already had, yes, that's the number I

 8    remember.

 9          All right, had hearings, and how many are sitting

10:24 10  there who have not yet had bail hearings?

11          MR. LE:  So it's unclear to the agency, but they

12    represent to me an estimate, which is not a definitive number,

13    which was 400, around 400.

14          THE COURT:  Four hundred are awaiting bail hearings.

15          MR. LE:  No, sorry, your Honor, that they are

16    post-hearing class members, and the government doesn't have a

17    number on prehearing class members at the moment.

18          THE COURT:  So there are 400 people sitting in jail

19    who have already had a hearing, and you don't know how many

10:25 20  people are sitting there awaiting a hearing.

21          MR. LE:  Again, the first number was an estimate that

22    the agency had provided for me because of my --

23          THE COURT:  The first number was what?

24          MR. LE:  Was an estimate --

25          THE COURT:  No, but how much was it, the first number

1     of people awaiting?

2              MR. LE:  450.

3              THE COURT:  450 are awaiting hearings.

4              MR. LE:  That's what the agency represented to me as

5     an estimate, your Honor.

6              THE COURT:  Sure, it could be 400, it could be 500,

7     but it's in the ballpark of 450 have not yet had bail hearings

8     and about 400 are post-hearing.  Am I getting this right?

9              MR. LE:  I just want to clarify, the government

10:25 10    doesn't have an estimate or a number on prehearing class

11    members.

12             THE COURT:  All right, so I understand.  There's no

13    number you have about how many people who are sitting in jail

14    who have not had any bond hearing at all.

15             MR. LE:  That's correct, your Honor, the government

16    doesn't have any number on that.

17             But just going back to the prejudicial injury aspect

18    of it, just doing a case comparison out of this district, it

19    shows why class action is probably inappropriate here because,

10:26 20    on the one hand, we have cases like Maldonado-Valasquez, and,

21    on the other hand, we have case like Pensamiento and Doe, and

22    the threshold determination and the difference between those

23    cases and on the former case there was -- we didn't even have

24    to get to the due process issue because there wasn't any

25    prejudicial injury to begin with as a threshold matter, whereas

1    the other cases, perhaps there were.

2            So, for that alone, the government submits and has

3    maintained from the beginning that a class-wide judgment would

4    be inappropriate, rather individual *habeas* petitions are the

5    appropriate remedy.

6            THE COURT:  But why wouldn't a declaration, at the

7    very least, make sense so that these people know what their

8    rights are and, if they wanted a habe, we'd give them the name

9    of the attorneys and they could come into Federal District

10:27 10   Court like any person, citizen or non-citizen, who is in

11   custody and seek due process.  They wouldn't know, many of them

12   don't speak English, right, they're certainly not trained as

13   lawyers, they might not know.

14           MR. LE:  Sure, your Honor.  And the government

15   previously has submitted to your Honor that declaratory relief

16   would also be inappropriate just because it would be

17   essentially the same thing as an injunctive relief because

18   there would be no teeth behind it because they could be just

19   right back here.

10:27 20          THE COURT:  Well, that's the goal, is to have them

21   know they could be right back here if they thought they were

22   prejudiced.  I mean, most of the people who are criminal aliens

23   who have no shot at it are detained mandatorily, so they're not

24   in this class.  It's mostly people who have no criminal record

25   whatsoever, right?  Unless there are certain situations, was it

Maldonado is the one that I said there was no prejudice or at

least --

            MR. LE:  It wasn't -- I don't think you were -- I

don't think this Court ruled on that.

            THE COURT:  It wasn't me.  There is at least one I

ruled on.  So I don't see how that is in any way a problem, to

give them notice of the decision, a declaration as to what the

burden should be and a list of attorneys if they want to

challenge it at the very least.

            MR. LE:  That goes towards the relief that --

            THE COURT:  Yes.

            MR. LE:  -- that the petitioners are asking for.  It's

just rather broad and outside the scope of really what meets --

what this case needs if your Honor were so inclined to rule on

their summary judgment.  Specifically, the three injunctive

reliefs that they're requesting is exactly what your Honor has

alluded to, and they're problematic both on a practical aspect

and on a legal expect.

            The second request of relief involves that if anybody

has been -- has believed that they suffer prejudice, they would

be able to have some sort of prejudicial hearing, and this is

problematic, one, because there's currently no, I guess,

administrative procedure for prejudicial hearings in

immigration court; and the another thing, a prejudicial

determination is a threshold determination for a constitutional

issue, which would be inappropriate for the agencies to make a finding on.

This prejudicial hearing that petitioners are requesting is pretty similar to the reasonableness hearing that the petitioners in the Reid class action had asked for and your Honor correctly found that that wouldn't be appropriate just given the constitutional --

THE COURT:  Is that on appeal, too?

MR. LE:  Pardon, your Honor?

THE COURT:  Is that on appeal, too?

MR. LE:  Reid, your Honor?

THE COURT:  Yes.

MR. LE:  A notice of appeal has been filed, yes, your Honor.

THE COURT:  The government filed it or -- both sides?

MR. LE:  Both sides, there was a cross-appeal, your Honor.

THE COURT:  Because we should be getting, within the next year or two anyway, some definitive rulings out of this circuit on all these issues, right?

MR. LE:  That's correct, your Honor, on both 1226(c) and 1226(a) for Doe.

Turning back to the prejudicial hearing that the petitioners had requested, it's just out of bounds for this case as a practical matter and a legal matter.

1          In terms of the list that the petitioners are

2     requesting, it's -- it's rather extensive, and your Honor

3     touched on it a bit.  And the one thing that the government

4     will highlight just for the sake of time is a preemptive

5     determination on prejudicial injury, again, the agencies are --

6     aren't in a position to make constitutional determinations when

7     it comes to their immigration proceedings.  That's what your

8     Honor has ruled, and I believe that that's undisputed at this

9     point.  Beyond that, it's just the amount of time it would take

10:31  10    to compile a list and have every single --

11          THE COURT:  How long would it take just to get a list

12     of people and where they're being located?  I think most people

13     are located in the same few jails, so I don't think that's as

14     hard.  I think I'm right about that.  Well, how hard would it

15     be to compile a list of all the people and their length of

16     detention, when they came in and -- when they came in?  It

17     couldn't be that hard.

18          MR. LE:  Well, your Honor, I'm not too familiar with

19     ICE's, I guess, query system.

10:31  20          THE COURT:  I imagine -- there's one of them, a couple

21     of them -- anyway, they gave me the medians and the percentage

22     of several have been over two years, right?  So I don't know

23     how many, but they gave me the -- what was the median?  Was it

24     four months or something like that?  And then there were some

25     that were shorter but there were some that were quite a long

1    time.  You could triage the ones that were there the longest.

2         MR. LE:  Your Honor, the -- I'm not familiar with

3    how -- how long it would take, but the length of detention, if

4    their analysis is that the very first bond hearing was the

5    defect and they're not challenging the prolonged detention, the

6    government doesn't see how it would be relevant for this

7    specific remedy.

8         THE COURT:  Just in terms of allocating resources.

9         MR. LE:  In terms of it would be going beyond the

10:32 10   legal issues that are presented within their *habeas* petition.

11        THE COURT:  Okay.

12        Could you help me on the Administrative Procedure Act.

13   I assume you folks in Washington are experts on this, you live

14   and breathe the Administrative Procedure Act.  Help me

15   through -- do you agree that the Administrative Procedure Act

16   applies to the Bureau of Immigration Appeals?

17        MR. LE:  To the extent that Chevron applies, your

18   Honor.  So the analysis kind of breaks down in various ways.

19   For instance, if the issue is silent, then -- rather, the

10:33 20   statute is silent on the issue, then we go to Chevron.

21        THE COURT:  Just -- it's a yes, no or no case has

22   ruled.  Does the Administrative Procedure Act apply to

23   decisions issued by the Bureau of Immigration Appeals?

24        MR. LE:  In this specific case, your Honor, regarding

25   APA arbitrary and capricious claims, the government submits no.

1          THE COURT:  Okay.  So all right.

2          And has anyone -- it's good to know the government's

3     position.  Have there been cases that have analyzed the

4     applicability of Administrative Procedure Act to opinions of

5     the Bureau of Immigration Appeal.

6          MR. LE:  No, your Honor, and that's probably because

7     that immigration cases, especially within this circuit, has

8     been afforded Chevron deference, especially if it's a decision

9     regarding the BIA, and that was highlighted in -- pardon me

10:34 10   here -- Soto-Hernandez v. Holder 729 F.3d 1 (1st Cir. 2013) in

11    that case, the 1st Circuit held that the BIA's legal

12    conclusions that concern statutes of regulations related to

13    immigration matters indeed fall under Chevron deference.  And

14    that's most likely why Chevron has been applied consistently

15    for BIA decisions.

16          THE COURT:  And that may be, but -- because the board

17    has to construe statutes and understanding who's entitled to

18    asylum, et cetera, but does the Administrative Procedure Act

19    apply?  And you would say -- just because Chevron applies

10:35 20   doesn't necessarily mean the Administrative Procedure Act

21    applies.

22          MR. LE:  Well, your Honor, in this case the government

23    submits that it doesn't need to apply because we would be going

24    under Chevron anyway is the appropriate analysis.

25          THE COURT:  So if the Bureau of Immigration Appeals

issues a holding that's precedential, just like our Supreme

Court, in a way, they're the Supreme Court of the immigration

system, if they issue an opinion and it's based on improper

legal grounds, let's say, and no one appeals it because the

immigrant's deported or removed but it has prospective value,

in other words, since 1999 people have been following this

ruling on bail, how does one challenge it?

MR. LE:  Well, your Honor, they would challenge it via

petition for review as a most --

10:36  THE COURT:  As of their own case.

MR. LE:  That's correct, your Honor.

THE COURT:  So let's say Mr. Brito, Mr. Lucas, and

Mr. Celicourt could challenge it in their case as being a

violation -- a misconstruction of the statute, say, because it

was applied that way, is that what it would be?  Would it be an

Administrative Procedure Act challenge?

MR. LE:  Your Honor, just to be clear, we're speaking

on a hypothetical.

THE COURT:  Yes.

10:37  MR. LE:  Gotcha, because they've been released.

Yes, that's exactly right.  Procedurally, the

petitioner would challenge it, challenge the IJ's decision to

the BIA, and the BIA would render a decision --

THE COURT:  And then where does that go?  If they

disagree with the BIA decision, can that be appealed to the 1st

1   Circuit or the Circuit Court?

2             MR. LE:  Yes, your Honor.

3             THE COURT:  On bail you can.  I thought that was a

4   discretionary decision.

5             MR. LE:  I believe it would be on the burden

6   allocation aspect of it, right, your Honor?

7             THE COURT:  I'm just trying to understand how it

8   works.  Someone's got to be able to review the BIA somewhere.

9   Okay.  So I certainly have authority and power to do it under

10:37 10   the Constitution.  There are a lot of jurisdiction stripping

11   provisions, but, for sure, you would say the 1st Circuit at

12   least should be able to review whether or not the allocation of

13   the burden under the statute is appropriate.  Now the Supreme

14   Court ruled in Jennings that the statute doesn't say that, so

15   it can't be under the statute, but you could argue that the

16   flip-flopping without inadequate explanation is a violation of

17   the APA, if the APA applies.  So I'm trying to understand what

18   the government's view is, can these, I guess gentleman -- is

19   Jacky a male or female?

10:38 20             MR. McFADDEN:  He's a man, your Honor.

21             THE COURT:  Could these gentlemen challenge before the

22   1st Circuit --

23             MR. LE:  I see what you're saying, your Honor.

24             THE COURT:  -- the application of a flipped burden

25   under the APA?

1       MR. LE:  The government doesn't have a response for

2  that right now, your Honor.

3       THE COURT:  I don't either.  I'm just saying, it's a

4  brand new claim that -- that's how they get creative, it's a

5  brand new claim.  But I take their concern that if the agency

6  just out of the blue changes its mind --

7       MR. LE:  Your Honor --

8       THE COURT:  -- someone should be able to review it.

9       MR. LE:  Just to clarify.  To the extent, your Honor

10:39 10  is referring to discretionary determinations on detention, your

11  Honor is correct, that wouldn't be reviewable.  But in this

12  specific case for the statute's burden allocation, I think if

13  we look at the case that the petitioner had cited, National

14  Cable and Telecommunications Ass'n, and that's a Supreme Court

15  case on Docket No. 68 at 12, that -- if I recall correctly,

16  that case lists various situations where Chevron would apply,

17  where different analysis, Skidmore would apply, and where the

18  APA would apply.  Most notably, the case notes that changes in

19  circumstances, changes in the law are usually are entitled to

10:40 20  Chevron deference.

21       In this specific instance, your Honor, 1226(a) was

22  promulgated in 1996 and Adeyemi Adeniji was determined in 1999.

23  So it's not necessarily flip in the same policy or under the

24  same law, so to speak, but rather it was in the wake of a new

25  amendment -- an amendment, so, therefore, it's not an

1    unexplained situation.

2         THE COURT:  Right, but who gets to challenge that?

3         MR. LE:  Which --

4         THE COURT:  Under the Administrative Procedure Act if

5    it applies?

6         MR. LE:  If it applies, I would imagine it would be

7    the individual petitioner.

8         THE COURT:  And not through this class action.  But I

9    would imagine -- I'm just trying to figure out whether I should

10:40 10   allow in this APA claim because even if I don't have

11   jurisdiction to review it, arguably the 1st Circuit does.

12        Do you oppose my adding the APA?

13        MR. LE:  In terms of modifying the class, your Honor?

14        THE COURT:  Yes.  It doesn't do much in terms of the

15   heft of what they're asking for, the due process clause does

16   most of the work, but it gives a basis for analyzing an issue

17   under the Administrative Procedure Act, too.

18        MR. LE:  To the extent that it -- the need for it and

19   also just failing on the merits alone, your Honor, the

10:41 20   government does oppose.

21        THE COURT:  Does, okay.

22        But, to your knowledge -- could you go back to your

23   people in Washington who must have a compendium of these things

24   and find out if they are aware of any cases where -- either the

25   Circuit or District Court or of course the Supreme Court, a

1  decision of the Bureau of Immigration Appeals has been

2  challenged under the Administrative Procedure Act?  That would

3  be really useful to find out.

4          MR. LE:  I will, your Honor.

5          THE COURT:  Thank you.

6          MR. LE:  Yes, your Honor.

7          In terms of -- if the government could just have a

8  moment just to discuss the standard of proof issue.

9          THE COURT:  Yes, of course.

10:42 10         MR. LE:  The government -- the government submits that

11  if your Honor were to submit any kind of judgment on this

12  issue, it would certainly -- should be consistent with

13  Pensamiento which follows more closely to what immigration

14  courts have imposed previously, and that's to the satisfaction

15  of the IJ.  And as your Honor pointed out, the government

16  doesn't need to necessarily use the least burdensome means to

17  accomplish its goal in order to comport with due process, that

18  is, and that's exactly why that satisfaction of the IJ would be

19  the proper standard here.

10:43 20         Just from a practical aspect, a lot of these

21  detainees, they haven't been here very long.  So for the

22  government to have the investigative burden to determine if

23  they have family members in the area or whether they had any

24  criminal history in their native country or what have you, I

25  believe that that information rests properly with the detainee

1    and readily would be available at a bond hearing.  So from that

2    practical aspect alone, the government submits that

3    satisfaction of the IJ --

4         THE COURT:  Many of the ones I've seen, I'm obviously

5    not at the border, at least at the southern border, so many of

6    them have been here for 20 and 30 years and under temporary

7    protected status or just they've been hiding.  So I'm generally

8    not seeing the one that has just been here briefly.

9         MR. LE:  I mean --

10:44 10        THE COURT:  Maybe -- do you fly all over the country?

11   You probably -- but up here we're mostly seeing people who are

12   certainly undocumented but they've been here a while.

13        MR. LE:  True, your Honor.

14        THE COURT:  They have American wives and kids and

15   sometimes even, in the Indonesian case, kids in the military.

16   It does strike me at least --

17        MR. LE:  That may be true, your Honor, but just from,

18   again, just from a practical standpoint, this is information

19   that's readily available by the -- by the detainee, him or

10:44 20  herself to be able to present at a bond hearing.  The detainees

21   have personal knowledge of their community ties, they have

22   personal knowledge of their criminal history here or in another

23   country.  So it would be more readily available for them to be

24   able to testify upon.  And that's just the practical aspect of

25   placing the burden and satisfaction of the IJ.

1          THE COURT:  So essentially putting some sort of a

2     burden of production on them but to put the burden of proof on

3     them, what's been striking for me when I've shifted the burden,

4     many of them have just gotten out because the government had

5     nothing.  So, you know, it's -- I'm not sure -- what you're

6     saying is -- let's say somebody puts forth I've been here for

7     20 years, I've got American children, I've got an American

8     wife, I've worked landscaping or, you know, in some restaurant

9     or something.  Shouldn't the burden be on the government to

10:45 10    then show that the person is a risk of flight?

11          MR. LE:  Your Honor, I've -- if this was under the

12     assumption that your Honor has already made up your Honor's

13     mind on the burden being on the --

14          THE COURT:  I'm just saying -- I understand your point

15     and I've struggled with what the standard should be, whether or

16     not to just track the criminal bail reform statute which is

17     sort of where I ended up with -- in Reid is where I ended up.

18     You're arguing that it should be to the satisfaction of the

19     immigration judge, but are we just playing with words?  Why

10:46 20    isn't that just preponderance of the evidence?

21          MR. LE:  I mean, based on -- for a number of reasons,

22     your Honor, because in immigration court they have consistently

23     placed this satisfaction of the IJ standard on -- based on

24     regulations that have been promulgated --

25          THE COURT:  They're putting it on the immigrant.

1          MR. LE:  That's right, your Honor.

2          THE COURT:  I shifted it -- how would that change

3     things if I shifted it, as I have?

4          MR. LE:  Shifting satisfaction with the IJ --

5          THE COURT:  The government has to prove it to the

6     satisfaction of the IJ, that's not switching the core issue of

7     who bears the burden.

8          MR. LE:  Right, right.  So if we were to shift it to

9     the government, your Honor, it would -- and if it was anything

10:47 10    more than satisfaction of the IJ or anything more than, you

11    know, preponderance, I suppose that then it would kind of have

12    this investigative burden that the -- that DHS would have to go

13    through and not necessarily really equipped to deal with all

14    the information that the detainee may have that may come out on

15    cross-examination.  That's exactly why the satisfaction of the

16    IJ would be appropriate here.

17         THE COURT:  It just had always been that way until

18    1999, right, for decades and decades, maybe for a hundred

19    years, who knows, the burden was on the government, and then

10:48 20    they flipped it, and it's made a difference.

21         MR. LE:  I mean, that it has, your Honor, but that's

22    just in the wake of the amendments in 1996.  So --

23         THE COURT:  All right.  Thank you.

24         Is there anything else you'd like to address?

25         (Pause.)

```
 1          THE COURT:  Well, let me ask you, do you agree with

 2   plaintiffs that there have been no Circuit Court cases on point

 3   since Jennings and -- would you agree there's been no appellate

 4   authority, that this would be the first appellate case

 5   post-Jennings?

 6          MR. LE:  Well, your Honor, not necessarily, and your

 7   Honor will probably disagree before, but, again, the government

 8   has highlighted that the 3rd Circuit --

 9          THE COURT:  That's a different issue.  I know that

10   case.

11          MR. LE:  All right, well --

12          THE COURT:  Thank you.  You've cited that to me

13   before.  It's nothing that's straight up, this issue?

14          MR. LE:  Not exactly on point, your Honor.

15          THE COURT:  Okay.

16          And how about are there District Court cases with

17   recent analysis that have come out the other way that I should

18   read?

19          MR. LE:  Again, the government doesn't -- isn't aware

20   of any.

21          THE COURT:  All right.  So it's been how many District

22   Court cases would you say that shifted the burden to the

23   government, 20, 30?

24          MR. LE:  Certainly keeping us busy, your Honor, but I

25   don't know the exact number off my head.
```

          1          THE COURT:  I just want to make sure I'm not missing

          2   something because I ruled on this, as you say, a year and a

          3   half ago and there's been a lot of activity.  I want to make

          4   sure I am current, there's not some persuasive authority out

          5   there that would cause me to change my mind.

          6          All right, thank you very much.

          7          Did you want to reply briefly?

          8          As I mentioned, I have a plea at 11:00.

          9          MS. McGEE-TUBB:  Yes, I will, very, very brief.  My

10:50    10   response points are just on the relief and the remedy.

         11          Your Honor had questions about 1252(f)(1), and in your

         12   class certification order in this case you acknowledged that

         13   that statute is not a bar to entering the injunctive relief

         14   we've requested here because the relief we've requested would

         15   not mandate release or allow an opportunity for release that's

         16   not provided in the statute.

         17          The government talked a bit about the prejudice issue

         18   and individualized issues, on that piece I would just note that

         19   the government has not moved to decertify the class.  Your

10:51    20   Honor acknowledged in certifying the class that prejudice did

         21   present some individualized concerns.  We have made our

         22   arguments that the individualized issues do not prevent

         23   class-wide relief because we're not asking for release, we're

         24   asking for constitutionally adequate bond hearings, and the

         25   prejudice issue can be determined as part of determining which

1   class members in the post-hearing class are entitled to relief.

2         Your Honor did grant both injunctive and declaratory

3   relief in Reid, which was for 1226(c) detainees, and in that

4   case in your injunction you set the bond hearing procedure and

5   you spelled out the terms for it, so we're asking for

6   something --

7         THE COURT:  Effectively the same, at least

8   prospectively.

9         MS. McGEE-TUBB:  Yes, with some --

10:51  10         THE COURT:  Change of the standard.

11         MS. McGEE-TUBB:  -- change of the standard, yes.

12         Also, just to respond to the point about petitioning

13   for a review to the 1st Circuit.  You can't -- an individual

14   can't petition for review to the 1st Circuit of a bond

15   decision.  That's -- 1226(e) prevents that, so what we're

16   talking about is 1st Circuit review of post-final BIA removal

17   orders and habeas decisions.  So this -- that's why it's so

18   important that we get the bond procedure right and that it's a

19   constitutionally adequate bond hearing.

10:52  20         THE COURT:  So there is no avenue for challenging a

21   Bureau of Immigration Appeals legal ruling.

22         MS. McGEE-TUBB:  With respect to a bond decision,

23   unless one makes the argument that the bond hearing was

24   unconstitutional and was not procedurally -- was -- I'm sorry,

25   was procedurally flawed.

```
 1              THE COURT:  But there is no Administrative Procedure
 2     Act avenue of appeal because of the jurisdiction stripping
 3     provision.
 4              MS. McGEE-TUBB:  Right.
 5              And then, finally, I just wanted to mention in terms
 6     of how do we move forward for the post-hearing class.  You
 7     know, your Honor could consider appointing a special master,
 8     perhaps a magistrate judge or former magistrate judge, to
 9     address these issues of prejudice.  Respectfully, providing
10:53 10   class members with a list of habeas attorneys and having them
11     each file individual --
12              THE COURT:  I give them your address.
13              MS. McGEE-TUBB:  Well, I'm sure Mintz Levin would love
14     to take on many people, but we have limited resources, as do
15     all of the people who represent immigrants in the current
16     climate.  And respectfully, these people need relief now, and
17     to the extent that we can streamline the prejudice
18     determinations on everybody's behalf to get people new bond
19     hearings if they're entitled to them, that would better serve
10:53 20   the immigrants and also effectively utilize resources.  So
21     while filing individual habeas petitions --
22              THE COURT:  One thing I've noticed, it's a huge
23     compliment to the members of Massachusetts and probably New
24     Hampshire bar, is attorneys have been stepping up to represent
25     individuals.  So it's not the way it used to be where it was
```

really hard to find someone who was willing to do this.  People

have been -- there are lawyers who are accessible, right?

MS. McGEE-TUBB:  That's true.  And, your Honor, I

actually have represented an individual in a *habeas* petition

and did successfully obtain his release in front of Judge

Sorokin.  Just anecdotally, it was a significant amount of

work.  It consumed a significant amount of my time.  And I was

very happy to do it, but we're talking potentially on the order

of hundreds of people.

THE COURT:  Yes, he said 450.

MS. McGEE-TUBB:  Yes, and so that is a lot of *habeas*

petitions for this Court, which I understand is already very

busy.  And perhaps if somebody like a special master could sort

of handle these collectively, we would both have consistent

applications of the prejudice standard and also potentially be

able to knock out a bunch of them to say there's very clearly

prejudice here, we don't need oral argument, we don't need

lengthy briefing.

THE COURT:  Thank you.

MS. McGEE-TUBB:  Thank you.

THE COURT:  Did you want to say one last word?

MR. LE:  Yes, your Honor.  And thank you for sister

counsel here.  That's correct, that the bond decision wouldn't

be --

THE COURT:  Would not.

```
 1              MR. LE:  You're right.  I was thinking of a different
 2    matter, your Honor.
 3              However, the government still maintains that Chevron
 4    is still the appropriate act just given Soto-Hernandez opinion
 5    on the matter.  So just to clarify the record on that, your
 6    Honor.
 7              And again --
 8              THE COURT:  And you're going to check and see if any
 9    Court has tangled with the APA and Board of Immigration Appeals
10:55 10   decisions or whether they've just done it on a straight up
11    Chevron analysis.
12              MR. LE:  That's correct, your Honor.
13              THE COURT:  That would be very useful.  I know you
14    have that whole appellate division there, probably --
15              MR. LE:  I will cross-reference with my colleagues,
16    your Honor.
17              THE COURT:  That's wonderful, thank you.
18              MR. LE:  And again, the last thing is that the remedy
19    that the petitioners are seeking, once again, it's what the
10:56 20   government has maintained from the beginning, and it's
21    inappropriate for the agencies to make prejudicial
22    constitutional analysis and determinations from the get go.  So
23    that's the only things, your Honor.
24              THE COURT:  All right.
25              Thank you very much to all of you for the excellent
```

|   |   |
|---|---|
| 1 | briefing.  I know I've asked a few of you to supplement a few |
| 2 | things.  Can you do it by Friday or Monday? |
| 3 | MS. McGEE-TUBB:  Yes. |
| 4 | THE COURT:  Tuesday, that's right.  And let me just |
| 5 | say one thing, which is, I'm hoping to have a decision out by |
| 6 | year end is my timing on everything, sooner if possible, but I |
| 7 | know we're hitting all the holidays.  I'm likely to make |
| 8 | whatever I do effective within 30 days but I don't want to ruin |
| 9 | someone's holiday period briefing over -- so I'm going to try |
| 10:57 10 | to time it so that you can take whatever steps you feel like |
| 11 | you need to do.  Because liberty is at stake, if I do a |
| 12 | preliminary injunction, I will say that there's likely to be |
| 13 | irreparable harm because someone is still in custody.  For me, |
| 14 | the whole thing boils down to likelihood of success because the |
| 15 | other factors weigh in favor of the plaintiff.  But I also |
| 16 | understand -- aren't you from here?  You told me that. |
| 17 | MR. LE:  Yes, your Honor. |
| 18 | THE COURT:  So you may be up here anyway, but I'm not |
| 19 | going to do something that is going to ruin your holiday.  So |
| 10:57 20 | we will give you enough time to do it, whatever appellate |
| 21 | relief you need, but it's sort of be within the level of 30 |
| 22 | days, not six months.  So that's how I'm thinking about it. |
| 23 | And thank you very much for the excellent briefing on |
| 24 | this very important case and I guess we'll stand in recess and |
| 25 | I need to move into my bail hearing -- gee, my plea of |

1    colloquy.  Thank you.

2            THE CLERK:  All rise.

3            (Court adjourned at 10:58 a.m.)

4                - - - - - - - - - - - -

5                       CERTIFICATION

6            I certify that the foregoing is a correct transcript

7    of the record of proceedings in the above-entitled matter to

8    the best of my skill and ability.

9

10

11

12   /s/Debra M. Joyce_____        November 7, 2019_____
     Debra M. Joyce, RMR, CRR, FCRR   Date
13   Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25