**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS**

GILBERTO PEREIRA BRITO, FLORENTIN
AVILA LUCAS, and JACKY CELICOURT,
individually and on behalf of all those similarly
situated,

          *Plaintiff-Petitioners*,

v.

WILLIAM BARR, et al.,

          *Defendant-Respondents*.

Case No. 19-11314-PBS

**<u>APPENDIX B</u>**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 18-2604 JGB (SHKx)** | Date | October 24, 2019 |
|---|---|---|---|
| Title | ***Ernesto Torres, et al. v. United States Department of Homeland Security, et al.*** | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:**    **Order (1) DENYING Federal Defendants' Motion to Dismiss (Dkt. No. 79) and (2) GRANTING in Part and DENYING in Part GEO's Motion to Dismiss (Dkt. No. 80) (IN CHAMBERS)**

Before the Court are a motion to dismiss by Defendants U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement, Kirstjen M. Nielsen, Ronald D. Vitiello, and David Marin, ("DHS's Motion," Dkt. No. 79), and a motion to dismiss by Defendant GEO Group, Inc. ("GEO"), ("GEO's Motion," Dkt. No. 80). The Court held a hearing on the Motions on October 21, 2019. After considering the oral argument and papers filed in support of, and in opposition to, the Motions, the Court DENIES DHS's Motion and GRANTS in part and DENIES in part GEO's Motion.

## I.    BACKGROUND

### A.    Procedural Background

This is a conditions of confinement case brought by immigrant detainees and legal organizations. On December 14, 2018 Plaintiffs Jason Nsinano, Desmond Tenghe, Ernesto Torres, American Immigration Lawyers Association ("AILA"), and Immigration Lawyers Association ("Imm Def") filed a putative class action complaint against Defendants. ("Complaint," Dkt. No. 1.) Plaintiffs filed a first amended complaint on February 28, 2019, which added Plaintiff Yakubu Raji. ("FAC," Dkt. No. 62.) Plaintiffs' FAC alleges six causes of action related to their detention at Immigration and Customs Enforcement ("ICE") contract

detention facilities in the southern California region: (1) violation of the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1229a(b)(4)(A)-(B), 1362; (2) violation of the Due Process Clause of Fifth Amendment of the U.S. Constitution ("procedural due process claim"); (3) violation of the Due Process Clause of the Fifth Amendment of the U.S. Constitution ("substantive due process claim"); (4) violation of the First Amendment of the U.S. Constitution, on behalf of AILA and Imm Def; (5) violation of the First Amendment of the U.S. Constitution, on behalf of individual Plaintiffs; and (6) violation of the Administrative Procedure Act ("APA"), as to Defendant ICE. Plaintiffs seek declaratory and injunctive relief, including that Defendants undertake measures to improve conditions of confinement. (FAC at 63-64.) Plaintiffs do not seek to overturn any decision in an immigration proceeding. (Id.)

DHS and GEO filed their Motions concurrently on May 31, 2019. (Dkt. Nos. 79, 80.) On July 8, 2019, the parties stipulated to dismiss Defendant Orange County Sheriff's Department ("OCSD"). (Dkt. No. 88.) On July 23, 2019, Plaintiffs voluntarily dismissed the claims of Yakubu Raji. (Dkt. No. 89.) Three days later, Plaintiffs filed an opposition to DHS's Motion, ("Opposition to DHS's Motion," Dkt. No. 90), and an opposition to GEO's Motion, ("Opposition to GEO's Motion," Dkt. No. 91). Defendants timely replied. ("DHS's Reply," Dkt. No. 96; "GEO's Reply," Dkt. No. 97.)

**B.    Factual Allegations**

Plaintiffs allege as follows. There is an immigration detention facility in San Bernardino County, "Adelanto," that can house approximately 1,900 individuals. (Id. ¶¶ 85, 88-90.) Two OCSD jails in Orange County also hold immigrants. (Id. at ¶ 4.) DHS and ICE detain immigrants in removal proceedings under color of federal immigration law. The government has a contract with GEO, which operates Adelanto, and OCSD, which operates the Orange County jails. Ernesto Torres ("Torres"), Desmond Tenghe ("Tenghe"), and Jason Sinagwana Nsinano ("Nsinano"), are immigrants formerly or currently detained under color of immigration law at these ICE contract detention facilities. (FAC ¶¶ 18-56.) Organizational Plaintiffs AILA and Imm Def are legal services organizations whose members advise, represent, and advocate for detained immigrants. (Id. ¶¶ 73-75.)

Defendants control the conditions of Plaintiffs' confinement: they restrict access to incoming and outgoing telephone calls, in-person attorney visitation, and legal mail inside Adelanto. (Id. at ¶ 4.) ICE has promulgated Performance-Based National Detention Standards ("PBNDS"), which GEO is contractually obligated to follow, but in practice Adelanto fails to comply with these standards in numerous respects. (Id. ¶ 92.) Defendants limit the duration of calls, sometimes to less than ten minutes, (id. ¶ 4), prevent detained immigrants from making free legal calls (even if they are indigent), (id. ¶¶ 94-98), restrict the availability and hours during which immigrants in administrative segregation can make paid or collect calls, (id. ¶¶ 105-06), charge expensive rates, (id. ¶ 101), impose onerous requirements (such as the "positive acceptance requirement" that a live person answer the phone, preventing immigrants from leaving voicemail), (id. ¶ 103), prevent detained immigrants from receiving incoming calls and messages, (id. ¶¶ 107-10), deny detained immigrants confidentiality during their legal calls by

monitoring and recording them, (id. ¶¶ 4, 111, 115-16), and fail to maintain phone connectivity and do not ensure phones are in good working order, (id. ¶¶ 116-19). For in-person legal visits, there are insufficient confidential visiting rooms, (id. at 120), and attorneys with appointments are at times forced to wait up to four-and-a-half hours to see their clients; those without appointments can wait even longer. (Id. ¶¶ 129-31.) Defendants frequently change or delay security clearances for interpreters, which hinders attorneys from speaking with clients for days or weeks. (Id. ¶ 132.) Legal mail is on occasion returned to sender though it is properly addressed, may arrive weeks late, and is at times opened, so it is not a reliable alternative method of communication. (Id. ¶¶ 133, 135). Nor is email a possible alternative, as the detainees do not have access to the Internet. (Id. ¶¶ 6, 134.)

The communication failures tolerated by Defendants have the effect of disrupting Immigrant Plaintiffs' representation—with lasting consequences not only for bond and removal proceedings, (id. ¶¶ 152-56), but also for legal matters outside immigration court. Immigrants detained at Adelanto may have pending habeas petitions, custody matters, criminal appeals, civil rights actions, family-court actions, and petitions for benefits, among other legal matters. (See, e.g., id. ¶¶ 165-66.) For unrepresented immigrants, contact with the outside world is even more critical: they must rely on the limited access Defendants provide to find representation and, when that fails, contact family members and friends to gather evidence in support of their cases (both in immigration court and in ancillary proceedings). (See id. ¶¶ 143-51, 157-64.)

Defendants' policies and procedures are so needlessly restrictive as to be punitive. Conditions at Adelanto—including for attorney visitation rooms and phone bays—are virtually indistinguishable from those imposed on pretrial detainees and convicted prisoners. (See id. ¶¶ 167-70.) ICE's 2011 PBNDS provide a less restrictive model that Defendants are contractually bound to follow, but in practice violate. (See id. ¶¶ 92, 96, 97, 101, 108, 120, 136, 170.) ICE knows of the violations of the PBNDS at Adelanto as well as two other contract facilities operated by the OCSD. (Id.)

## II. LEGAL STANDARD

Defendant moves to dismiss the FAC pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. A Rule 12(b)(1) motion challenges the court's subject matter jurisdiction, without which, a federal district court cannot adjudicate the case before it. See Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375 (1994). Pursuant to Rule 12(b)(1), a party may seek dismissal of an action for lack of subject matter jurisdiction "either on the face of the pleadings or by presenting extrinsic evidence." Sierra v. Dep't. of Family and Children Servs., 2016 WL 3751954, at *3 (C.D. Cal. Feb. 26, 2016) (quoting Warren v. Fox Family Worldwide, Inc., 328 F.3d 1136, 1139 (9th Cir. 2003)). Thus, a jurisdictional challenge can be either facial or factual. White v. Lee, 227 F.3d 1214, 1242 (9th Cir. 2000). In a facial attack, the moving party asserts that the allegations contained in the complaint are insufficient on their face to invoke federal jurisdiction. Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004). When evaluating a facial attack, the court must accept the factual allegations in the plaintiff's complaint

as true. <u>Comm. for Immigrant Rights of Sonoma Cty. v. Cty. of Sonoma</u>, 644 F. Supp. 2d 1177, 1189 (N.D. Cal. 2009).

"By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." <u>Safe Air for Everyone</u>, 373 F.3d at 1039. In resolving a factual challenge, the court "need not presume the truthfulness of the plaintiff's allegations" and "may look beyond the complaint to matters of public record without having to convert the motion into one for summary judgment." <u>White</u>, 227 F.3d at 1242. "Where jurisdiction is intertwined with the merits, [the Court] must 'assume the truth of the allegations in the complaint . . . unless controverted by undisputed facts in the record.'" <u>Warren</u>, 328 F.3d at 1139 (quoting <u>Roberts v. Corrothers</u>, 812 F.2d 1173, 1177 (9th Cir. 1987)).

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in a complaint. "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." <u>Mendiondo v. Centinela Hosp. Med. Ctr.</u>, 521 F.3d 1097, 1104 (9th Cir. 2008). Factual allegations must be enough to "raise a right to relief above a speculative level." <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007). Rule 12(b)(6) must be read in conjunction with Federal Rule of Civil Procedure 8(a), which requires a "short and plain statement of the claim showing that a pleader is entitled to relief," in order to give the defendant "fair notice of what the claim is and the grounds upon which it rests." <u>Id.</u>; <u>see</u> <u>Horosny v. Burlington Coat Factory, Inc.</u>, 2015 WL 12532178, at *3 (C.D. Cal. Oct. 26, 2015). In considering a Rule 12(b)(6) motion to dismiss, a court accepts the plaintiff's factual allegations in the complaint, and construes the pleadings in the light most favorable to the non-moving party. <u>See</u> <u>Shwarz v. United States</u>, 234 F.3d 428, 435 (9th Cir. 2000). Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 679 (2009).

## III.    DISCUSSION

Defendants argue the Court lacks subject matter jurisdiction to hear this case due to jurisdiction-stripping provisions of the INA, 8 U.S.C. § 1252. Defendants also argue Plaintiffs lacked standing to bring the action or that their claims have become moot due to events since the action commenced. Finally, Defendants argue that each cause of action fails. The Court considers each of these arguments in turn.

## A.    Potential Jurisdictional Obstacles in 8 U.S.C. § 1252

Defendants raise several potential obstacles to jurisdiction found in the INA, 8 U.S.C § 1252. (DHS Mot. at 4-10; GEO Mot. at 15-17.) Each is a facial challenge to the Court's ability to hear claims touching on immigration removal. The Court first addresses § 1252(a)(5) and (b)(9) and determines the provisions do not prevent review of Plaintiffs' claims. The Court may hear each of Plaintiffs' claims, because they focus on conditions of confinement only. The claims are not inextricably a part of the removal process and, as such, § 1252's prohibitions do not apply.

The Court then turns to § 1252(f)(1), which Defendants argue prevents class-wide injunctive relief.  The Court concludes that § 1252(f)(1) also does not deprive it of jurisdiction.

### 1.  Title 8 U.S.C. § 1252(a)(5) and (b)(9): Jurisdictional "Channeling" of Certain Removal-Related Claims

Defendants' first facial challenge to jurisdiction relies on two subsections of 8 U.S.C § 1252.  The section is entitled "[j]udicial review of <u>orders of removal</u>." (emphasis added.)  Subsection (a)(5), states in pertinent part:

> [A] petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter[.]

Subsection (b)(9), entitled "[c]onsolidation of questions for judicial review," states:

> Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section.

Under these provisions, claims that arise from the removal process must bypass the district court and instead be heard through the administrative process.  Judicial review is only by the Court of Appeals via a petition for review ("PFR").  Courts refer to this effect as jurisdictional "channel[ing]," and have dubbed § 1252(b)(9) a "zipper clause."  <u>Reno v. Am.-Arab Anti-Discrim. Comm.</u>, 525 U.S. 471, 482–83 (1999).  The two subsections are typically read together.  <u>J.E.F.M. v. Lynch</u>, 837 F.3d 1026, 1031 (9th Cir. 2016); <u>see also</u> <u>Cancino-Castellar v. Nielsen</u>, 338 F. Supp. 3d 1107, 1111 (S.D. Cal. 2018) ("Section 1252(a)(5) is central to Section 1252(b)(9)'s scope.").

Defendants argue that § 1252(a)(5) and (b)(9) prevent this Court from hearing immigration detainees' conditions of confinement claims, because such claims "arise from" removal proceedings or actions taken to remove immigrants from the United States.  (DHS Mot. at 4-10; GEO Mot. at 15-17.)  Defendants rely principally on a Ninth Circuit decision, <u>J.E.F.M. v. Lynch</u>, for a sweeping interpretation of the provisions that would be "vise-like" in grip, and "swallow[] up virtually all claims that are tied to removal proceedings."  837 F.3d at 1031 (citing <u>Aguilar v. Imm. and Customs Enforcement</u>, 510 F.3d 1, 9 (1st Cir. 2007)).

But <u>J.E.F.M.</u> is equally clear that the INA does not channel "claims that are independent of or collateral to the removal process."  837 F.3d at 1032 (citing <u>Aguilar</u>, 510 F.3d at 11).  Sections 1252(a)(5) and (b)(9) will not pull away from district courts claims that are "independent or ancillary" and not "bound up in and an inextricable part" of the administrative process.  <u>Id.</u> (citing <u>Martinez v. Napolitano</u>, 704 F.3d 620, 623 (9th Cir. 2012)).

Section 1252's jurisdictional channel does not preclude this Court from deciding Plaintiffs' claims, because they are ancillary to the removal process. <u>Aguilar</u>, a First Circuit case upon which <u>J.E.F.M.</u> principally relies, assumed that claims regarding detention conditions are independent of removal proceedings. 510 F.3d at 12. Thus, claims regarding the conditions of immigration detention that are not challenges to removal proceedings likely fall outside of the channeling provisions. Conditions of confinement claims treat an aspect of the removal process typically distant, legally and factually, from the scope of § 1252(a)(5) and (b)(9). And as the title of § 1252 suggests, the proper object of jurisdictional channeling is a claim that seeks "judicial review of orders of removal." <u>Singh v. Gonzales</u>, 499 F.3d 969, 978 (9th Cir. 2007) (focusing jurisdictional inquiry on whether the claim seeks review of a final order of removal).

Justice Alito made the point in <u>Jennings v. Rodriguez</u>, a class action challenge to prolonged detention, in which he concluded that § 1252 did not prevent the district court from assuming jurisdiction. 138 S. Ct. 838, 840-41 (2018). A district court clearly has jurisdiction, notwithstanding the channeling provisions, where the plaintiffs:

> are not asking for review of an order of removal; [] are not challenging the decision to detain them in the first place or to seek removal; and [] are not challenging any part of the process by which their removability will be determined.

138 S. Ct. at 841. Justice Alito decisively rejected Justice Thomas's expansive reading of § 1252(b)(9) that would require channeling of any and all claims about removal-related detention. 138 S. Ct. at 840 ("[T]his expansive interpretation . . . would lead to staggering results."). In other words, jurisdictional eddy currents exist where it would be "absurd" to "cram[] judicial review of those questions into the review of final orders." <u>Id.</u> "The question is not whether detention is an action taken to remove an alien but whether the legal questions in this case arise from such an action." 138 S. Ct. at 841 n.3.

Plaintiffs' claims focus on the conditions of their confinement. They do not seek review of removal orders. (FAC at 63-64.) The face of the FAC takes for granted the legitimacy of the decision to detain Plaintiffs and seek their removal. As a result, the dispositive jurisdictional question is—following Justice Alito's formulation—whether Plaintiffs' conditions of confinement claims challenge "any part of the process by which their removability will be determined." 138 S. Ct. at 841.

Plaintiffs take pains to tailor their claims only to the conditions of their removal-related detention, and do not challenge the legal sufficiency or any procedural aspect of their removal proceedings. That their claims are clear and away from the removal process is most certain with regard to the First Amendment claims (third and fourth causes of action), and APA claim (sixth cause of action). But with regard to the INA and Due Process claims (first, second, and third causes of action), the legal question inches closer to "the process by which . . . removability will be determined," 138 S. Ct. at 841, and so the Court must be mindful of the channel.

Plaintiffs' INA and procedural due process claims do not hinge on events at any particular removal proceeding. In <u>Arroyo</u>, a recent case with similar causes of action, plaintiffs challenged transfer decisions made by ICE. 2019 WL 2912848 at *2 (C.D. Cal. 2019). Here, as in <u>Arroyo</u>, Plaintiffs' claims are based on a right protecting the attorney-client relationship from undue burden or interference. <u>Id.</u> at *13. <u>Arroyo</u>'s logic is even more applicable here, where detention conditions are set by Defendants' global policies, and do not hinge on case-by-case determinations made by ICE about an individual's transfer. The Court therefore concludes that it may review the INA and procedural Due Process claims of Plaintiffs in this case as well.

This conclusion extends to both represented and unrepresented Plaintiffs. In <u>Arroyo</u>, the Court reviewed represented plaintiffs' INA and Due Process claims, but could not examine unrepresented plaintiffs' claims that did not present injuries collateral to the removal process. <u>Id.</u> at *12-14. This case presents distinguishing features that permit the Court to review all claims: unrepresented Plaintiffs here make extensive allegations regarding conditions so restrictive as to prevent them from forming any attorney-client relationship to begin with. (FAC ¶ 11.) This harm may arise with regard to non-removal immigration proceedings in which immigrants have statutory rights, for example <u>Joseph</u> hearings, as well non-immigration civil and criminal matters, completely apart from the removal process. As a result, both represented and unrepresented Plaintiffs assert INA and Due Process claims arising solely from the conditions of their detention and assert rights that can be violated without reference to the effect on their underlying removal proceedings. <u>Cf. id.</u> at *13-14.

The limited jurisdiction of Immigration Judges ("IJ") supports this result, since an IJ is powerless to remedy the conditions alleged. <u>See, e.g.</u>, 8 C.F.R. §§ 1240.1, 1240.31, 1240.41; Executive Office for Immigration Review, <u>Immigration Court Practice Manual</u> at 125 (rev'd June 10, 2013) ("Immigration Judges have no jurisdiction over . . . the conditions in the detention facility."). Though this Court previously noted that nonreviewability of a claim by an IJ is "not the standard" permitting district court jurisdiction by itself, 2019 WL 2912848 at *14, nonreviewability may still be a factor indicating that Plaintiffs' claims are independent or ancillary to removal proceedings. <u>Cancino-Castellar</u>, 338 F. Supp. 3d at 1114 (noting that Justice Alito's analysis in <u>Jennings</u> did not end with the fact that claims of prolonged detention were effectively unreviewable, but went further to look at whether the issues were "cognizable in the PRF process"). Although right to counsel issues do sometimes appear in immigration proceedings and related PFRs, (DHS Mot. at 6), they are cognizable only in a narrow sense. The focus of a PFR is categorically different: whether to overturn a decision below. This requires a determination that the BIA or IJ acted contrary to law, not whether the conditions of confinement were lawful. The legal question and remedy sought in a PFR are thus distinguishable from those presented by Plaintiffs' conditions-only case, which is not cognizable in the PFR process.

As a result, the Court holds that it has jurisdiction to consider Plaintiffs' first and second causes of action, because they challenge only conditions of confinement and do so without calling into question the underlying removal process. Having arrived at this result, the Court has little difficulty determining that it also has jurisdiction over the third cause of action, which is a

substantive Due Process claim regarding lack of telephone access, barriers to legal visits, and interference with legal mail.

### 2. Title 8 U.S.C. § 1252(f)(1) Bar on Certain Class-Wide Injunctive Relief

Defendants' second facial attack on jurisdiction is that Congress prohibited courts from entering class-wide injunctive relief that could halt the removal process. (DHS Mot. at 13-14; GEO Mot. at 8.) Defendants summon § 1252(f)(1), which "prohibits federal courts from granting class-wide injunctive relief against the operation of §§ 1221–1231."[1] AADC, 525 U.S. 471, 481 (1999). Defendants argue that the requested injunctive relief would affect "DHS's authority to determine appropriate detention facilities." (DHS Mot. at 14 (citing 8 U.S.C. § 1231(g)(1).)

Plaintiffs' remedial request is not within the scope of § 1252(f)(1)'s prohibition. The relief they request, far from preventing the operation of the INA, seeks to enforce its provisions and would be more likely to expedite than stop the removal process. (FAC at 63-64) (requesting an order that Defendants undertake to provide: private calls, space for confidential and timely legal consultation, a process for allowing legal calls outside of free time, a reliable method for sending messages and scheduling calls, accommodations for indigent noncitizens to make calls, regular call connectivity, interpretation services, and improved legal mail procures).)

Defendants do not adequately explain how the requested relief could "enjoin or restrain operation" of the relevant provisions. They assert vaguely that the relief would prevent the government from making determinations about appropriate facilities as § 1231(g) envisions. But Plaintiffs only seek to enjoin conduct not authorized by the INA and that violates Defendants' own minimum detention standards. Rodriguez v. Hayes, 591 F.3d 1105, 1118–21 (9th Cir. 2010) (determining § 1252(f)(1) did not prevent a class action challenging prolonged detention, because plaintiffs requested only an injunction to remedy a violation of the INA and declaratory relief); Ali v. Ashcroft, 346 F.3d 873, 886–87 (9th Cir. 2003) (holding § 1252(f)(1) did not prevent a class-wide injunction barring removal to a country without a functioning government, since the action did not seek to enjoin the operation of the statute and involved policies, practice, and constitutional issues), opinion withdrawn on denial of reh'g sub nom. Ali v. Gonzales, 421 F.3d 795 (9th Cir. 2005); R.I.L-R v. Johnson, 80 F. Supp. 3d 164, 183-84 (D.D.C. 2015) (concluding that 242(f)(1) prohibits injunctions that stop the operation, not the incorrect application, of the law). The relief requested here would not prevent the operation of the law, but force Defendants to comply with it. 8 USCA § 1229a(a)(4) (requiring that noncitizens "have the privilege of being represented, at no expense to the Government," by counsel of their choosing and a "reasonable opportunity" to present evidence).

A second reason Defendants' argument fails is that an exception to § 1252(f)(1) applies. The exception covers "the application of such provisions to an individual alien against whom

---

[1] Sections 1221-1231 fall under Chapter IV, "Inspection, Apprehension, Examination, Exclusion, and Removal."

proceedings under such part have been initiated." Id. § 1231(g)(1); see also Arroyo, 2019 WL 2912848, at *7 (discussing the exception). The Ninth Circuit suggested that 1252(f)(1) does not apply where all individuals in a putative class are individuals against whom removal proceedings have been initiated. See Rodriguez v. Marin, 909 F.3d 252, 256-57 (9th Cir. 2018). The exception to § 1252(f)(1) discussed in that case did not require that every detainee in the class still be in removal proceedings, as Defendants contend (DHS Reply at 9), but rather that proceedings have been "initiated." Id. As a result, § 1252(f)(1) does not prevent class-wide injunctive relief in this case.

## B. Standing and Mootness

Next, the Court turns to the parties' contentions regarding standing and mootness. First, Defendants argue that three of four individual Plaintiffs lack standing. (DHS Mot. at 4; GEO Mot. at 11-14.) Second, GEO claims that organizational Plaintiffs lack standing to sue. (GEO Mot. at 14; GEO Reply at 5-6.) Finally, Defendants argue that all claims related to the Orange County facilities are moot. (DHS Mot. at 12; GEO Mot. at 11.) The Court first analyzes standing, then turns Defendants mootness arguments.

### 1. Individual and Organizational Plaintiffs' Standing

To establish Article III standing, a plaintiff must demonstrate that: (1) he suffered an injury in fact that is concrete, particularized, and actual or imminent (not conjectural or hypothetical); (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992). A plaintiff's standing is assessed as of the time an action was initiated and is unaffected by subsequent developments. See D'Lil v. Best W. Encina Lodge & Suites, 538 F.3d 1031, 1036 (9th Cir. 2008). A Plaintiff must establish standing with respect to each claim and form of relief. Wildearth Guardians v. United States EPA, 759 F.3d 1064, 1070–1072 (9th Cir. 2014) (organization had standing to challenge only certain EPA decisions); Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 185 (2000) (requiring plaintiff to show standing separately for injunctive relief and civil penalties).

### a. Individual Plaintiffs' Standing

Defendants argue that Nsinano and Tenghe lack standing. (DHS Mot. at 21; GEO Mot. at 11-14).[2] With regard to Nsinano, Federal Defendants emphasize that he was ordered released on bond as of the filing of the FAC. (DHS Mot. at 21 (citing FAC ¶ 47).) But this occurrence since the date of filing is irrelevant to the standing inquiry. The focus of standing must be the interest of the plaintiff at the commencement of the action. When Plaintiffs filed the Complaint on December 14, 2018, Nsinano was detained at an OCSD facility, (Compl. ¶ 37), and therefore

---

[2] Plaintiff Raji was dismissed from the suit by joint stipulation of the parties, so the Court need not assess whether he had standing. (Stipulation, Dkt. No. 87.)

had a sufficient stake in the outcome of the proceeding at that point. Tenghe was also detained at the time, at Adelanto, (Compl. ¶ 28).[3]

Both Plaintiffs allege sufficient injury. Their allegations exhaustively list specific, redressable injuries traceable to Defendants. First, Tenghe alleges that while at Adelanto he attempted to call attorneys to seek representation "multiple times" and over "several weeks," (FAC ¶ 33), but the "positive acceptance" requirement at Adelanto prevented the calls from connecting. (Id.) He further alleges he could not make free calls and couldn't access commissary funds from a previous ICE contract facility. (Id. ¶ 34.) A ten-minute call to his host country cost a week of earnings from working at Adelanto, so his family abroad could not help him secure additional affidavits needed for his asylum claims. (Id. ¶ 35.) He alleges it took two months to navigate Adelanto's phone system just to set up an account to speak with a cousin in Maryland, who could also help gather documents crucial for his case. (Id. ¶ 36.) He also alleges extreme delays in receiving mail crucial to his asylum claim, and that some mail was never received at all. (Id. ¶ 37.) Similarly, Nsinano satisfies the injury requirement. He alleges both ICE and OCSD confine noncitizens in cells for twenty-two hours a day, and often prevent calls during business hours. (Id. ¶ 47.) He alleges Federal Defendants knew he could not make legal calls for four weeks but did not act, (id.), and that ICE's phone restrictions prevented him from speaking with attorneys, (id. ¶ 54). He alleges his motion to reopen at the BIA was denied in part because he could not make calls to obtain country conditions reports needed for his asylum appeal. (Id. ¶ 49.)

Next, the Court examines whether the injury alleged is traceable to Defendants and if injunctive relief would redress the injury. With respect to Federal Defendants, both Nsinano and Tenghe allege these conditions were a result of ICE's failure to follow its own rules, and so amount to a violation of the APA. (FAC ¶¶ 211-215). They trace the injury to ICE, though they were at different contract facilities at the time the Complaint was filed. Both allege that violations occurred "under Defendant ICE's authority and with ICE's knowledge," (id. ¶ 92), and despite contractually binding detention standards that ICE could have enforced, (id. ¶¶ 70 n. 4, 72 nn. 5-6) (incorporating by reference Office of the Inspector General ("OIG") reports stating that ICE may require compliance with performance-based detention standards). As a result, the harm alleged was traceable to ICE and it is likely the relief requested, (id. at 63-63), would redress many of the inadequacies alleged.

Only Tenghe and Torres[4] were detained at GEO's facility, Adelanto, at the time of filing. Though Nsinano was held at Adelanto for about two years, at the time of filing the Complaint he was at a different facility, and he does not allege any risk of being returned to Adelanto. Past

---

[3] Torres was detained at Adelanto as of the filing of the Complaint as well as the FAC.

[4] Federal Defendants do not dispute that Torres had standing, but Defendant GEO does. (GEO Mot. at 13.) The Court determines that Torres has standing to sue both Defendants. At the time of filing, Torres was detained at Adelanto. (Compl. ¶ 18.) Like Tenghe and Nsinano, he alleges specific examples of GEO and ICE interfering with his right to access counsel and to communicate with the outside world to prepare for hearings. (FAC ¶¶ 24-27.)

wrongs do not necessarily "show a present case or controversy regarding injunctive relief." City of Los Angeles v. Lyons, 461 U.S. 95, 102, 105 (1983). Instead, a plaintiff must demonstrate that he "is threatened with a 'concrete and particularized' legal harm, coupled with a 'sufficient likelihood that he will again be wronged in a similar way.'" Bates v. United Parcel Serv., Inc., 511 F.3d 974, 985 (9th Cir. 2007) (citations omitted). Thus, only Tenghe and Torres alleged a concrete redressable harm at the time of filing sufficient to sue GEO. Nsinano did not.

In sum, Nsinano's claims for injunctive relief against GEO are DISMISSED for lack of standing. The other individual Plaintiffs have standing to sue both GEO and Federal Defendants for injunctive relief.

### b. Organizational Plaintiffs' Standing

GEO argues that AILA and Imm Def lack either direct organizational or (indirect) associational standing to sue.[5] (GEO Mot. at 14; GEO Reply at 5-6.) Plaintiffs in turn argue that the FAC sufficiently pleads both theories of standing. (Opp. to GEO Mot. at 11-1.) The Court concludes that Imm Def has adequately asserted direct organizational standing and AILA has asserted associational standing.

"[O]rganizations are entitled to sue on their own behalf for injuries they have sustained." Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 n.19 (1982). In order to establish standing, an organization, like an individual, must establish: "(1) injury in fact; (2) causation; and (3) redressability." La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest, 624 F.3d 1083, 1088 (9th Cir. 2010). Direct organization standing can be satisfied if the organization alleges "(1) frustration of its organizational mission; and (2) diversion of its resources to combat the particular [issue] in question." Smith v. Pac. Props. & Dev. Corp., 358 F.3d 1097, 1105 (9th Cir. 2004); Fair Hous. of Marin v. Combs, 285 F.3d 899, 905 (9th Cir. 2002). A setback to the organization's abstract social interest without a discussion of resources is not sufficient to constitute standing. Serv. Women's Action Network v. Mattis, 2018 WL 2021220, at *14 (N.D. Cal. May 1, 2018).

GEO does not dispute that the missions of AILA and Imm Def are frustrated by policies or practices at Adelanto. It only argues that the organizations fail to meet the "diversion of resources" prong of the direct organizational standing test above. (GEO Reply at 9.)

An alleged resource diversion must go beyond litigation costs and beyond "fixing a problem that otherwise would not affect the organization at all." City of Lake Forest, 624 F.3d at 1088 (9th Cir. 2010).[6] Under this test, Imm Def satisfies the resource diversion prong of direct

---

[5] Federal Defendants make no argument regarding organizational Plaintiffs' standing to sue.

[6] The Court is unaware of, and GEO does not provide, any authority in which the individualized proof inquiry has been examined in relation to an organization's direct standing (as opposed to representational standing).

---

**CIVIL MINUTES—GENERAL**  Deputy Clerk MG

organizational standing. First, Imm Def alleges a diversion of resources separate from the costs of this case. Imm Def alleges its attorneys represent detainees at Adelanto, (FAC ¶ 75), and that Adelanto detainees may "never be able to reach" their attorneys on the phone due to conditions at the facility, (FAC ¶ 101). The organization also alleges that Adelanto prevents detainees from knowing when an attorney needs to speak with them, and fail to provide privacy, which chills attorney-client conversation. (FAC ¶¶ 109, 111, 115-16.) As a result of these and other difficulties alleged, Imm Def asserts that its employees waste time traveling to meet clients in person, and that if conditions were improved, "each Imm Def attorney could significantly increase the number of detained noncitizens they represent." (FAC ¶ 148-49.) Second, Imm Def adequately alleges the diversion is to fix a problem that affects its mission. The problems listed and organizational resources allegedly squandered go to the core of Imm Def's mission to provide free legal services to noncitizens in Southern California. (FAC ¶ 75.) Thus, Imm Def has adequately plead facts to establish standing.

AILA, on the other hand, has not alleged facts sufficient to establish direct organizational standing as to GEO. AILA only claims it has had to develop practice resources to help its members "meet, consult with, talk to, and locate" clients, and has "submitted organizational comments" regarding access to counsel. (FAC ¶ 74.) As pleaded, these organizational efforts are not linked to the Adelanto facility. Though the Court could infer from the FAC that AILA has had to divert these resources at least in part because AILA members represent detained noncitizens at Adelanto, (FAC ¶ 73), without more, the diversion is too tenuously linked to Adelanto to give rise to direct organizational standing, especially given that AILA is a national membership organization. Similarly, AILA's allegation that it has documented restrictions on access to counsel, (FAC ¶ 74), does not alone lead to an inference that resources have been diverted to recording conditions at Adelanto.

Having ruled out direct standing, the Court must consider GEO's argument that AILA also lacks representational standing. (GEO Mot. at 14; GEO Reply at 5-6.) Associational standing allows an organization to sue on behalf of its members, even absent a direct injury to the organization itself. This form of standing is established where a plaintiff shows: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977). GEO claims the first prong has not been satisfied, because AILA fails to name a specific member attorney that would have standing in her own right, and only makes general allegations about harms suffered by its members. (GEO Reply at 6.)

The Court agrees with Plaintiffs that it is not necessary at this early stage to name specific members impacted by the alleged violations. Lujan v. Defs. of Wildlife, 504 U.S. 555, 561, (1992) ("'we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" (quoting Lujan v. National Wildlife Federation, 497 U.S. 871, 889 (1990)). Here, AILA alleges its members lose time travelling to meet clients at Adelanto due to the communication obstacles at the facility and could represent more clients were it not for the

difficulties alleged. (FAC ¶¶ 150-51). Assuming the truth of this assertion, the Court reasonably infers that at least one AILA member attorney has standing to sue in her own right. As a result, AILA, as well as Imm Def, have plead facts sufficient to establish standing to sue GEO.

### 2.    Mootness

Defendants argue that individual Plaintiffs' claims are moot due to events since the time of filing. Tenghe was granted relief and released from Adelanto; Torres, although still held at Adelanto, has obtained counsel; and Nsinano was released on bond. (GEO Mot. at 13; GEO Reply at 3-5.) In addition, Federal Defendants argue that all claims arising out of conditions at the OCSD facilities are moot, because OCSD was dismissed as a Defendant and has terminated its agreement with ICE. (DHS Reply at 7.) These arguments raise factual questions about events since the commencement of the action and are properly analyzed under the rubric of mootness.

Mootness is "the doctrine of standing set in a time frame: the requisite personal interest that must exist at the commencement of litigation (standing) must continue throughout its existence (mootness)." United States Parole Comm'n v. Geraghty, 445 U.S. 388, 397 (1980) (internal quotation marks omitted). A claim becomes moot when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome. Haro v. Sebelius, 747 F.3d 1099, 1110 (9th Cir. 2014) (citation omitted).

An exception to the mootness doctrine exists for legal violations "capable of repetition, yet evading review." Gerstein v. Pugh, 420 U.S. 103, 110 n.11 (1975). Based on this exception, the Ninth Circuit has held that plaintiffs with mooted individual claims can maintain claims for injunctive relief where they "are challenging an ongoing government policy." See United States v. Howard, 480 F.3d 1005, 1010 (9th Cir. 2007), overruled on other grounds, United States v. Sanchez-Gomez, 859 F.3d 649 (9th Cir. 2017). In particular, this mootness exception "applies to ongoing policies affecting pretrial detainees, because pretrial detention usually will be too brief for the challenged policy to be reviewed before becoming moot." Los Angeles Unified Sch. Dist. v. Garcia, 669 F.3d 956, 958 n.1 (9th Cir. 2012), certified question answered, 58 Cal. 4th 175 (2013).

Moreover, where a plaintiff's claim becomes moot while he seeks to certify a class, his action will not be rendered moot if his claims are "inherently transitory" (such that the trial court could not have ruled on the motion for class certification before his or her claim expired), as similarly-situated class members would have the same complaint. See Pitts v. Terrible Herbst, Inc., 653 F.3d 1081, 1090-91 (9th Cir. 2011) (describing how this "relation back" doctrine applies in class actions). The justification for this rule is that such claims are "capable of repetition, yet evading review." See id.

### a.    Effect of Dismissal of OCSD

The parties agree that OCSD terminated its contracts with ICE. And since the filing of Defendants' Motions, the parties stipulated to dismiss OCSD. (DHS Mot. at 5; Stipulated

---

Dismissal, Dkt. No. 87.)  The only point of disagreement is whether this moots any of the claims against Federal Defendants.  Plaintiffs argue that the termination does not render any claims against Federal Defendants moot, because none of Plaintiffs' claims for relief against Federal Defendants is specific to OCSD facilities.  (Id.)  Federal Defendants argue that the claims "based on" the Orange County facilities should be dismissed as moot, (DHS Mot. at 23), but in their Reply ask that the Court "dismiss all allegations concerning County facilities . . . to the extent they are moot."  (DHS Reply at 12 (emphasis added).)

A motion under 12(b)(1) or 12(b)(6) is not the proper vehicle for Defendants' reframed request.  The Court cannot "dismiss allegations."  Rather, Defendants may move to strike any "redundant, immaterial, impertinent, or scandalous matter" under Rule 12(f).  Whittleston, Inc. v. Handi-Craft Co., 618 F.3d 970, 973 (9th Cir. 2010) (internal quotation marks omitted).

Plaintiffs' allegations regarding the county facilities do not meet this standard.  The allegations are relevant to Plaintiffs' claim that Federal Defendants approve practices at those facilities and that the practices "flout the ICE Detention Standards."  (FAC ¶¶ 89, 96, 170.)  Though Plaintiffs take aim at ICE's "policies, practices, and omissions in the future," ICE's past practices in the region are at least relevant to whether and how it implemented those policies at Adelanto and how it might do so going forward.  (FAC ¶ 173.)  Plaintiffs "challenge the legality of [] access and use policies, practices, and omissions under the INA, the Due Process Clause, the First Amendment, and the Administrative Procedures Act,"  (FAC ¶ 178), and further request that the Court declare that ICE's "actions and practices" constitute violations of the law.  Tolerance of violations at facilities other than Adelanto would be relevant to establishing that Federal Defendants' actions with regard to Adelanto are part of an ongoing policy or custom at ICE.

### b.    Effect of Individual Plaintiffs' Changed Circumstances

Defendants contend that individual Plaintiffs' injunctive claims are moot, because they have either received some form of relief and release or have obtained counsel.  (GEO Mot. at 13-14; DHS Reply at 13.)  Plaintiffs ask that the Court permit Plaintiffs to continue to assert claims on behalf of themselves and on behalf of the putative class.  (Opp. DHS Mot at 14.)

Defendants do not dispute Torres is still detained at Adelanto.  His individual claim for relief has not been mooted by the fact that he retained counsel.  Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc., 484 U.S. 49, 66 (1987) (holding the defendant "must demonstrate that it is absolutely clear that the allegedly wrongful behavior could not be reasonably expected to recur") (citation and internal quotation omitted).  Defendants do not argue that the alleged interferences with attorney-client communication no longer exist at Adelanto.  As a result, Torres' individual claims continue to present a live controversy.

Because Nsinano and Tenghe challenge ongoing actions and policies at Adelanto, which they also argue are approved by ICE,  (FAC ¶¶ 89, 170, 174.), they may also maintain their individual claims for relief under the ongoing policy exception to the doctrine of mootness.  This

Court noted in <u>Hernandez v. Lynch</u> that the Ninth Circuit permits plaintiffs with mooted individual claims to maintain those individual claims for injunctive relief where they challenge "an ongoing government policy." 2016 WL 7116611 at *12 (citing <u>U.S. v. Howard</u>, 480 F.3d 1005 1010, <u>overruled on other grounds by</u> <u>United States v. Sanchez-Gomez</u>, 859 F.3d 649 (9th Cir. 2017); <u>Los Angeles Unified Sch. Dist. V. Garcia</u>, 669 F.3d 956, 958 n.1 (9th Cir. 2012). <u>Howard</u>, in turn, relied on <u>Oregon Advocacy Center v. Mink</u>, a case in which plaintiffs challenged policies in pretrial detention facilities not unlike the immigration detention centers here. 322 F.3d 1101, 1118 (9th Cir. 2003).

All three individual Plaintiffs, moreover, can maintain their claims as putative class representatives under a second mootness exception for "inherently transitory" claims. <u>Id.</u> at *13. As the Ninth Circuit explained in <u>County of Riverside v. McLaughlin</u>, '[t]hat the class [is] not certified until after plaintiffs' claims [become] moot does not deprive [the Court] of jurisdiction" if the claims are "inherently transitory." 500 U.S. 44, 52 (1991). Federal Defendants fail to respond to Plaintiffs' argument that this exception permits the claims to move forward against them. (DHS Reply at 13.) Federal Defendants only assert that Plaintiffs' representative interest in the Orange County facilities has expired. (<u>Id.</u>) This assertion does not prevent application of the "inherently transitory" exception. Plaintiffs' claims relate to ongoing ICE policies and to an ICE contract facility at which all three Plaintiffs were—or still are—detained. The Court concludes that Plaintiffs resemble those plaintiffs before them held in jail and so present a "classic example of a transitory claim." <u>Wade v. Kirkland</u>, 118 F.3d 667 (9th Cir. 1997).

Finally, the Court is not persuaded by GEO's argument that Plaintiffs' due process-based claims are moot because they cannot show prejudice. (GEO Mot. at 13-14; GEO Reply at 2-3) To support this claim, GEO cites to precedent on standing, not mootness, and to merits decisions. The Court has already determined Plaintiffs asserted the requisite injury.[7] And whether prejudice is an element of a due process claim is a merits question. Neither the removal of OCSD as a Defendant nor Plaintiffs' change in circumstances moot any claim for relief against any remaining Defendant.

## C.    Sufficiency of Pleadings

Finally, Defendants argue that each of Plaintiffs' claims for relief must be dismissed. The Court considers and rejects a threshold argument by GEO—that it cannot be sued for constitutional violations—then examines each of Plaintiffs' six claims in turn.

//

---

[7] GEO equates the injury required for standing with the prejudice needed for a due process claim. (GEO Reply at 3 n.1.) These are separate inquiries. Standing is a test for the irreducible constitutional <u>minimum</u> required for a federal court to have jurisdiction and its requirements stem from Article III of the Constitution. <u>Lujan</u>, 504 U.S. at 560. Prejudice is an element of certain due process claims and is a different bar to clear.

### 1. GEO

GEO argues that it is not a state actor, and therefore cannot be held liable for constitutional violations. (GEO Mot. at 21.) But because GEO performs the federal function of holding immigration detainees, the conditions of confinement at its facilities are the result of "state action" and it may be liable for constitutional violations. See Manhattan Cmty. Access Corp. v. Halleck, 139 S. Ct. 1921 (2019) (discussing application of public-function test in the context of outsourcing of government obligations); see also Doe v. United States, 831 F.3d, 316 (5th Cir. 2016); Bromfield v. McBurney, 2008 WL 2746289, at *5 (W.D. Wash. July 8, 2008) ("[B]ecause the power to detain immigrants is derived solely and exclusively from federal authority, the GEO defendants, in effect, acted as the government's alter ego in detaining plaintiff, and the fact that the task of detaining plaintiff and other immigrants was temporarily delegated to the GEO defendants does not convert that detention into anything other than an exclusively governmental function."). The Ninth Circuit also recently held GEO employees can be considered federal agents liable for constitutional violations. Pollard v. Geo Group, Inc., 629 F.3d 843, 854 (9th Cir. 2010), rev'd on other grounds sub nom, Minneci v. Pollard, 565 U.S. 118 (2012). The Court holds that GEO may be sued for constitutional violations.

### 2. Immigration and Nationality Act Right to Counsel (First Cause of Action)

Plaintiffs' first claim for relief is under the INA, 8 U.S.C. §§ 1229a(b)(4)(A), (B) and 1362. (FAC at 57.) The Court begins by examining the relevant statutory text, and considers whether a private right of action may be implied against GEO. Finally, the Court weighs the sufficiency of Plaintiffs' allegations that their INA rights have been violated by Defendants' detention conditions.

#### a. The Relevant Provisions

Section 1229a(b)(4) reads in relevant part:

(A) the alien shall have the privilege of being represented, at no expense to the Government, by counsel of the alien's choosing who is authorized to practice in such proceedings,

(B) the alien shall have a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien's own behalf, and to cross-examine witnesses presented by the Government but these rights shall not entitle the alien to examine such national security information as the Government may proffer in opposition to the alien's admission to the United States or to an application by the alien for discretionary relief under this chapter, . . .

//
//
//

---

Section 1362 reads:

> In any removal proceedings before an immigration judge and in any appeal proceedings before the Attorney General from any such removal proceedings, the person concerned shall have the privilege of being represented (at no expense to the Government) by such counsel, authorized to practice in such proceedings, as he shall choose.

The parties treat these provisions as creating separate interests: first an interest in accessing counsel at no cost to the government, under §§ 1229a(b)(4)(A) and 1362. See Biwot v. Gonzales, 403 F.3d 1094 (9th Cir. 2005); second, a statutory interest in a full and fair opportunity to present one's case, irrespective of whether one has obtained counsel, under § 1229a(b)(4)(B).

### b.  Implied Right of Action under These Provisions

GEO contends[8] it cannot be sued under the INA, which does not contain an explicit private right of action.  (GEO Mot. at 18-19.)  Plaintiffs respond that a right of action may be implied using ordinary tools of statutory interpretation.  (Opp. to GEO Mot. at 23.)

The controlling authority on implied rights of action is Alexander v. Sandoval, 532 U.S. 275, 285 (2001).  "In determining whether a statute gives rise to an implied right of action, '[t]he judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy."  532 U.S. at 286.  The focus of the inquiry is congressional intent underlying the statute at issue.  Id.  "The factors the court must consider include whether the plaintiff is a member of the class for whose special benefit the statute was enacted; whether there is any indication of legislative intent to imply a civil remedy for the plaintiff; whether it is consistent with the statute's purpose to allow a private right; and whether the cause of action is traditionally relegated to state law."  Cort v. Ash, 422 U.S. 66, 78, (1975); see also Royal Bus. Group, Inc. v. Realist, Inc., 933 F.2d 1056, 1060 (1st Cir.1991) (noting that these factors "although clearly subordinate to the 'central inquiry' into congressional intent remain useful [a]s guides to discerning that intent . . .").  The fourth factor is not at issue, because immigration is a federal matter.  Plyler v. Doe, 457 U.S. 202, 225 (1982).  As a result, the Court focuses on the first three Cort factors.

First, the Court must examine the statutory text to determine whether there is rights-creating language directed to a class of people that includes Plaintiffs.  "[T]he right- or duty-creating language of the statute has generally been the most accurate indicator of the propriety of implication of a cause of action."  Cannon v. Univ. of Chicago, 441 U.S. 677, 690, n. 13 (1946).  For example, the Supreme Court found a statute "decree[ing] that 'no person shall be subjected to discrimination'" contains rights-creating language, and, therefore, creates an implied right of action.  Sandoval, 532 U.S. at 289-90 (citing Cannon, 441 U.S. at 690, n. 13).  On the other hand,

---

[8] The Court does not consider this argument with respect to ICE.  The Government does not make it, and Plaintiffs invoke the APA as a vehicle.

"a statute that merely describes how the federal government will effectuate or enforce rights does not contain rights-creating language." Sandoval, 532 U.S. at 288-89. Thus, a statute "phrased as a directive to federal agencies engaged in the disbursement of public funds" does not contain rights-creating language. Universities Research Ass'n, Inc. v. Coutu, 450 U.S. 754, 772.

The INA provisions here at issue include rights-creating language, with an "an unmistakable focus on the benefitted class." Coutu, 450 U.S. at 772. And Plaintiffs are obviously among those for whose benefit the statute was enacted. Section 1229a(b)(4) is entitled "[a]lien's rights in proceeding," and states that in proceedings, "under regulations of the Attorney General," the noncitizen "shall have the privilege of being represented." 8 U.S.C. § 1229a(b)(4)(A). Black's Law Dictionary defines "privilege" as a "special legal right, exemption, or immunity granted to a person or class of persons." Privilege, Black's Law Dictionary (11th ed. 2019). Section 1362 similarly endows a privilege of representation upon "person[s] concerned" with removal proceedings. The plain meaning of these provisions is that a class of persons— individuals in immigration proceedings—have a "right" or "privilege" to be represented in those proceedings by counsel of their choosing and to examine and present evidence on their own behalf. Finally, § 1229a(b)(4)(B) states the "person concerned shall have a reasonable opportunity to examine . . . [and] present evidence." 8 U.S.C. § 1229a(b)(4)(B).

This statutory text does not read as a simple instruction to the Government detailing how to enforce or effectuate rights. Nor is this a mere "definitional section," that cannot be construed to create a right of action. Dowling, 479 F. Supp. 1018, 1020 (D. Mass. 1975). The provisions are not only rights-creating but are a reiteration of procedural and substantive rights as such, to clarify that they apply in immigration proceedings. Biwot v. Gonzales, 403 F.3d 1094, 1098 (9th Cir. 2005) (explaining that these rights "stem[] from the Fifth Amendment"). The rights-creating language is also evident from regulations passed pursuant to these provisions. For example, 8 C.F.R. §§ 287.3(c) and 1238.1 both reference a "right" to counsel as well. Sandoval emphasized that language in regulations—though not creating rights by itself— may invoke a private right of action that Congress created through statutory text. 532 U.S. at 291.

This language is compelling. Cannon v. University of Chicago, 441 U.S. 677, 690 n. 13 (1979) ("[T]his Court has never refused to imply a cause of action where the language of the statute explicitly conferred a right directly on a class of persons that included the plaintiff in the case . . . ."). In an abundance of caution, the Court looks also to the INA's structure to weigh Cort's second and third factors, indicators of legislative intent to imply a cause of action and consistency with the statute's purpose.

In Transamerica, the Supreme Court examined another statute and noted it is "highly improbable that Congress absentmindedly forgot to mention and intended private action." 444 U.S. at 20. The INA contains no such explicit right of action. Nevertheless, Plaintiffs argue, implied rights of action in the INA have been found before. (Opp. GEO Mot. at 25 (citing Vega v. Nourse Farms Inc., 62 F. Supp. 2d 334, 340-41 (D. Mass. 1999) (finding implied right of action under statute designed to protect domestic workers); Int'l Union of Bricklayers v. Meese, 616 F. Supp. 1387, 1397 n. 8. (N.D. Cal. 1985).) For its part, GEO highlights cases where courts did not

imply a cause of action in the INA. (GEO Mot. at 19 (<u>Singh v. Cissna</u>, 2018 WL 4770737, *7 (E.D. Cal. Oct. 1, 2018); <u>North Jersey Media Group, Inc. v. Ashcroft</u>, 205 F. Supp. 2d 288, 303-304 (D.N.J. 2002), <u>rev'd on other grounds</u>, 308 F.3d 198 (3d Cir. 2002); <u>Huiwu Lai v. United States</u>, 2018 WL 1610189, at *4 (W.D. Wash. Apr. 3, 2018)).) However, the cases cited by GEO are inapposite, as they do not involve statutes with strong rights-creating language.

The Court discerns from the structure of the INA a Congressional intent to benefit people in immigration proceedings and to allow them to enforce these rights. The INA's primary purpose is to assure that the immigration and naturalization of immigrants is carried out in an orderly fashion. <u>Collyard v. Washington Capitals</u>, 477 F. Supp. 1247, 1255 (D. Minn. 1979). The INA also limits the government's conduct in deporting immigrants, and reiterates that immigrants retain rights during that process, including a right to counsel. <u>Castro-O'Ryan v. U.S. Dep't of Immigration & Naturalization</u>, 847 F.2d 1307, 1312 (9th Cir. 1987) (holding, with respect to 8 U.S.C. § 1362 that "Congress wanted to confer a <u>right</u>"). The right appears to be integral to the INA's foundation, because Congress mentions the right in two disparate sections of the 1952 immigration code and has declined to substantially modify it since. <u>See</u> Pub. L. No. 82-414, §§ 242, 292, 66 Stat. 209, 235 (June 27, 1952). A private right of action is therefore consistent with this legislative scheme, and directly advances the main purpose of the INA.

The Court ends its inquiry here, and refrains from considering legislative history when statutory text and structure are conclusive. <u>See</u> <u>Sandoval</u>, 532 U.S. 276; <u>Escondido Mutual Water Co. v. La Jolla, Rincon, San Pasqual, Pauma, and Pala Bands of Mission Indians</u>, 466 U.S. 765 (1984) (noting that absent a clearly expressed legislative intention to the contrary, the statutory language is to be regarded as conclusive). Plaintiffs may sue to enforce the right to counsel provision.

c.      **Right to Access Counsel under 8 U.S.C. §§ 1229a(b)(4)(A) and 1362**

To state a claim under § 1229 involving access to counsel, unrepresented plaintiffs must sufficiently allege conditions that are "tantamount to denial of counsel," <u>Biwot</u>, 403 F.3d at 1099-1100. On this question, the parties debate the impact of <u>Lyon v. U.S. Immigration and Customs Enforcement</u>, 171 F. Supp. 3d 961, 965 (N.D. Cal. 2016). <u>Lyon</u> was a summary judgment decision in which the plaintiffs failed to present evidence that telephone restrictions alone were "tantamount to denial of counsel." 171 F. Supp. 3d at 975 (quoting <u>Biwot</u>, 403 F.3d at 1099). Whereas plaintiffs in <u>Lyon</u> alleged only overly restrictive telephone policies, Plaintiffs allege restrictions on telephone access as well as difficulty with legal mail, in-person meetings, and numerous other obstacles. The cumulative nature of the hindrances alleged permits the Court to distinguish <u>Lyons</u> and to reasonably infer that the conditions of confinement alleged, if true, were tantamount to the denial of counsel. (FAC ¶¶ 23-24, 32-39, 44-45, 105, 144 (alleging Torres's eight calls to seek an attorney could not be completed due to the positive acceptance requirement, and that Tenghe and Nsinano could not retain attorneys).)

Represented plaintiffs in a conditions case face a less stringent obligation. To state a claim, they must allege Defendants' conduct interfered with "established, on-going attorney-

client relationship[s]." Comm. of Cent. Am. Refugees v. INS, 795 F.2d 1434, 1439 (9th Cir. 1986); accord Arroyo 2019 WL 2912848 at *17; Orantes-Hernandez v. Meese, 685 F. Supp. at 1509; Orantes-Hernandez v. Thornburgh, 919 F.2d at 566 (finding plaintiffs sufficiently alleged actions that "interfere[d] with established attorney-client relationships"). Plaintiffs assert that when they retained counsel for certain proceedings, Defendants would "impede [] vital attorney-client exchanges by limiting the means by which detained noncitizens and attorneys . . . can communicate confidentially." (FAC ¶ 154). This allegation is not specific to any particular Plaintiff, except Nsinano. He alleges interference with an established attorney-client relationship while he was held at an OCSD facility, (id. ¶ 54), but has standing only with respect to ICE. Tenghe and Torres do not sufficiently allege interference with an established attorney-client relationship. Accordingly, Tenghe and Torres have "unrepresented" individual claims against both Defendants. Nsinano does not have standing regarding his treatment while unrepresented at Adelanto. But he states a "represented" individual claim, against Federal Defendants only.

Federal Defendants argue that Plaintiffs' statutory claims fail because they were never forced to proceed without counsel. (DHS Mot. at 15.) Defendants cite normal PFR channel cases to support this position. (Id. (citing Montes-Lopez v. Holder, 694 F.3d 1085, 1089-1090 (9th Cir. 2012); Tawadrus v. Ashcroft, 364 F.3d 1099, 1105 (9th Cir. 2004); Castro-O'Ryan v. INS, 847 F.2d 1307, 1312-1314 (9th Cir. 1987).) In each of these cases, the Ninth Circuit concluded that an IJ violated a noncitizen's statutory right to counsel under §§ 1229a(b)(4)(A) and 1362, typically by denying a continuance, forcing the noncitizen to proceed without counsel, or incorrectly concluding the immigrant had waived that right. (Id.) Federal Defendants infer from this line of cases that they cannot have violated Plaintiffs' statutory rights, because a necessary element of each case is a mistaken decision by the IJ which impacted the proceeding.

The Court rejects this argument. Even if an IJ granted infinite continuances, the statutory rights would never be realized if an immigrant's custodians could effectively block access to counsel. The right to counsel would be meaningless if indefinite continuances were the remedy. And caselaw suggests the right to counsel codified in the INA extends beyond the removal proceeding itself. See Orantes-Hernandez v. Thornburgh, 919 F.2d 549, 554 (9th Cir. 1990); County of Nevada v. Superior Court, 236 Cal. App. 4th 1001, 1007 (2015); Orantes-Hernandez v. Meese, 685 F. Supp. 1488, 1509 (C.D. Cal. 1988). In Thornburgh, for example, the Ninth Circuit upheld a district court's permanent injunction dealing with the "right to consult with counsel." 919 F.2d at 564. The Thornburgh Court noted that regulations adopted to effectuate 8 U.S.C. § 1362 required not only IJs but immigration officials to take measures to protect the right, including providing notice of the right to counsel. Id.[9]

---

[9] The Ninth Circuit upheld the injunction, in part because authorities maintained faulty service provider lists, and this was only "the first of numerous obstacles, the cumulative effect of which was to prevent aliens from contacting counsel and receiving any legal advice." 919 F.2d at 565. Similarly, detainee access to telephones was "severely limited due to time restrictions" and the "system of informing detainees of attorneys' phone calls was not reliable." 919 F.2d at 566.

---

Nor need Plaintiffs allege conditions that "have prejudiced Plaintiffs by forcing them to appear pro se at a substantive hearing." (DHS Mot. at 16.) Plaintiffs do not seek direct or indirect review of an IJ decision, or of any aspect of any removal proceeding. If they did, as previously discussed, the claims would come closer to the removal process and would risk being swept into § 1252's jurisdictional channel. Defendants also ignore that the right to access counsel begins before any court proceeding, with notices from the agency to the immigrant and with the detention itself.[10]

Federal Defendants' motion to dismiss Plaintiffs' §§ 1229a(b)(4)(A) and 1362 claims is DENIED. GEO's request to dismiss these claims is GRANTED with respect to Nsinano's injunctive claims and DENIED in all other respects.

### d. Right to Examine and Present Evidence under § 1229a(b)(4)(B)

The second part of Plaintiffs' INA claim invokes the right to examine and present evidence under 8 U.S.C. § 1229a(b)(4)(B). The standard here will be the same: Plaintiffs must sufficiently allege conditions (here, related to difficulty gathering and presenting evidence) that are "tantamount to denial of counsel." Biwot, 403 F.3d at 1099-1100.

Both Defendants emphasize that the evidence provision only requires them to provide resources for Plaintiffs to have a "reasonable opportunity" to present evidence. (DHS Reply at 17; GEO Mot. at 15.) They state the telephone practices Plaintiffs allege have at most an attenuated effect on statutory rights, and so are insufficient to sustain a claim. (DHS Mot. at 27.) Federal Defendants lean on Hopper v. Melendez, for this argument. 2007 WL 4111366, at *7-8 (W.D. Wash. Nov. 16, 2007). The facts of that case distinguish it from this action, however. In Melendez the court rejected an "unfettered or unlimited right" to confidential calls in the face of a single detainee's insistence that 169 numbers be placed on the free call list. Id. at *8. In contrast, Plaintiffs do not seek an unfettered or unlimited access to telephones for evidence-gathering but ask at minimum that Defendants undertake to comply with detention standards, for example, by "provid[ing] detained noncitizens the ability to make private, unmonitored, unrecorded legal telephone calls." (FAC at 57.)

Federal Defendants next argue that the statutory right to a full and fair hearing and to a "reasonable opportunity" to present evidence is violated only if the proceeding was so "fundamentally unfair" that the immigrant is "prevented from reasonably presenting his case." Colmenar v. INS, 210 F.3d 967, 971 (9th Cir. 200) (citing PFR decision reviewing an

---

[10] See, e.g., 8 U.S.C. § 1229(b)(1) ("In order that an alien be permitted the opportunity to secure counsel before the first hearing date . . . the hearing date shall not be scheduled earlier than 10 days after the service of the notice to appear . . .") (emphasis added); 8 C.F.R. § 287.3(c) (providing that an immigrant arrested without a warrant must be notified of her "right to be represented at no expense to the Government"); 8 U.S.C. § 1228(a) (requiring the agency, while removing immigrants with certain convictions, to "make reasonable efforts" to ensure "access to counsel and right to counsel under [8 U.S.C. § 1362] are not impaired.").

uncounseled proceeding). Colmenar also explains that before reversing a BIA decision, a court must be satisfied the plaintiff has demonstrated prejudice. Id.; see also Lianhua Jiang v. Holder, 754 F.3d 733, 741 (9th Cir. 2014).

The Court emphasizes it is not called upon to review the fundamental fairness of any particular hearing. As a result, Plaintiffs need not allege prejudice. Even if they did, the "potential[]" for prejudice, Biwot, 403 F.3d at 1100, can be inferred at the pleading stage. Plaintiffs and other detainees are housed in Adelanto because they face the possibility of removal, and Plaintiffs allege Defendants' actions or inaction impedes their ability to properly present evidence. (FAC ¶¶ 22, 158-9, 164.) They also allege generally[11] that Defendants "restrict noncitizens' ability to conduct calls necessary to obtain witness affidavits and declarations" and block them from obtaining key evidence from administrators, police departments, hospitals, schools, and nongovernmental organizations. (FAC ¶¶ 103, 162.) They allege Defendants fail to keep phone service active, neglect to repair inoperable phones, and do not provide service to all countries. (FAC ¶¶ 117-19.) Plaintiffs claim that legal mail policies also obstruct their ability to gather (and by implication, present) evidence and put them at risk of procedural defaults. (FAC ¶ 135.)

Federal Defendants' motion to dismiss Plaintiffs' § 1229a(b)(4)(B) claim is DENIED. GEO's request to dismiss this claim is GRANTED with respect to Nsinano's injunctive claim and DENIED in all other respects.

### 3. Procedural Due Process (Second Cause of Action)

Like the INA provisions, the Due Process Clause of the Fifth Amendment requires that noncitizens be permitted to retain counsel of their choice at no expense to the government, Baltazar-Alcazar v. I.N.S., 386 F.3d 940, 944 (9th Cir. 2004), and establishes a right to a full and fair hearing in removal cases, Colmenar, 210 F.3d at 971. Having found sufficiently alleged violations of statutory rights, the Court also finds Plaintiffs sufficiently allege Due Process violations. Biwot, 403 F.3d at 1098 (noting the statutory provisions "codif[y]" rights "rooted in the Due Process Clause").

---

[11] Beyond these generalized assertions, Tenghe alleges he could not obtain tax documents needed to establish sponsorship, resulting in "material[] and demonstrabl[]e harm [to him] and his ability to present his asylum claim." (FAC ¶¶ 37-38.) Nsinano alleges his asylum application and BIA appeal were rejected in large part due to conditions at Defendants' facilities, which prevented him from gathering supporting documents on past persecution and country conditions. (FAC ¶ 46.) Nsinano also alleges ICE prevented him from making international calls to human rights organizations to obtain evidence to establish his claims and represent himself, and that on "multiple occasions" he could not file evidence with the immigration court or BIA. (FAC ¶¶ 48-49) (citing specific instances.) Torres was required to gather evidence without an attorney and could not access many of the documents needed because of Defendants' policies. (FAC ¶¶ 26-27.) Considering these exhaustive and specific pleadings, the Court determines that all three individual Plaintiffs sufficiently allege violations of 8 U.S.C. § 1229a(b)(4)(B).

Defendants again contend that Plaintiffs' allegations do not support an inference of prejudice and cite authority where courts have held that prejudice is required to reverse an administrative proceeding. (DHS Mot. at 29 (citing Tawadrus, 364 F.3d at 1105; Castro-O'Ryan v. U.S. Dep't of Immigration & Naturalization, 847 F.2d 1307, 1313 (9th Cir. 1987).) The Court rejects this argument here as well. Plaintiffs do not seek to reverse any decision by an IJ or the BIA, so prejudice is not a requirement. See Comm. of Cent. Am. Refugees v. I.N.S., 795 F.2d at 1439 (noting a significant burden on the attorney-client relationship, without a showing of underlying prejudice to the removal proceedings, may be sufficient to establish a legal injury sufficient to justify injunctive relief). Even if prejudice is required, Plaintiffs sufficiently allege potential prejudice at the pleading stage.

Federal Defendants' motion to dismiss individual Plaintiffs' procedural due process claim is DENIED. GEO's motion to dismiss this claim is GRANTED with respect to Nsinano's injunctive claims and DENIED in all other respects.

### 4. Substantive Due Process (Third Cause of Action)

Plaintiffs' third claim for relief is that their conditions of confinement are so excessive as to be punitive, in violation of their substantive due process rights. (FAC ¶¶ 167-70, 195-98). See Jones v. Blanas, 393 F.3d 918, 931 (9th Cir. 2004) (holding civil detainees cannot be subjected to punitive conditions of confinement).

Plaintiffs and Federal Defendants agree that civil detainees retain greater liberty protections than criminal pretrial detainees and prisoners, but they disagree how the Court should ascertain at what point conditions become punitive. (DHS Mot. at 32; Opp. DHS Mot. at 27-28.) In the controlling case, Jones, the restrictions imposed on a civil detainee, including limitations on phone calls and visitation, were more restrictive than those imposed on a jail's general population. 393 F.3d at 934. Faced with these operative facts, the Ninth Circuit held that if a civil detainee is not afforded "more considerate" treatment, 393 F.3d at 934 (citing Youngberg v. Romeo, 457 U.S. 307, 321-22 (1982)), this creates a rebuttable presumption of punitiveness, which defendants may counter by offering legitimate, non-punitive justifications for the restrictions. Id.

GEO moves to dismiss this claim, because Plaintiffs do not sufficiently allege any punitive or excessive restriction. (GEO Mot. at 24.) Federal Defendants emphasize that they may impose certain restrictions on the liberty of immigration detainees pursuant to legitimate government interests in security and facility management. (DHS Mot at 20-21 (referencing Jones, 393 F.3d at 932, Valdez v. Rosenbaum, 302 F.3d 1039, 1046 (9th Cir. 2002).) They argue Plaintiffs must show alleged restrictions are "in fact" excessive as compared to their administrative purpose. (Id. at 21-22 (citing Jones, 393 F.3d at 933-34).)

Plaintiffs' allegations are sufficient to create a presumption of punitiveness. They claim Defendants do not grant them more considerate treatment than that typically afforded non-

---

　　　　**CIVIL MINUTES—GENERAL**　　　　Deputy Clerk MG

immigration detainees: restrictions at Adelanto on immigrants' telephone and visitation access are allegedly "similar, if not identical, to restrictions imposed on pre-trial detainees and convicted prisoners." (FAC ¶¶ 67, 170.) Plaintiffs also make detailed allegations regarding access to counsel, and assert these conditions are not more considerate than those at pretrial and prison facilities. (Id. ¶¶ 169-70.) Plaintiffs incorporate by reference a 147-page public report by the California Department of Justice, (id. at 54 n.30), which enumerates obstacles to retaining and communicating with counsel and to self-representation at facilities including Adelanto, see California Department of Justice, Immigration Detention in California, at iv, 125-128 (February 2019). Exhibit E to the Complaint provides a criminal pretrial comparator for the conditions alleged at Adelanto by listing telephone procedures required in that setting. (Compare Ex. E, Dkt. No. 62-5 at 3-5 (noting inmates may correspond confidentially, that three calls are available in the first three hours after arrest, that non-collect calls are available in many holding cells, that parents may make additional calls to arrange for child care, that that phones are available in housing areas, tanks, and roof recreation areas, that non-collect calls may be approved, and that phone calls may be recorded and monitored), with FAC ¶¶ 32-36, 44, 88-92, 93-98, 100-06.) As a result, Plaintiffs sufficiently allege conditions at Adelanto and policies by ICE that are not "more considerate" than at criminal facilities.

Moreover, at the pleading stage, Defendants could only rebut the presumption by referencing assertions in the FAC or by reference to judicially noticeable material showing the detainees are treated better than prisoners. Defendants do not attempt to do so, and so fail to rebut the presumption. The only potential non-punitive justification offered is that Defendants are required by statute to maintain a secure facility for certain immigrants, pending the outcome of their proceedings. (DHS Mot. at 31 (citing 8 U.S.C. § 1231(g)(1)'s requirement that ICE arrange for appropriate places of detention).) However, as the Ninth Circuit recognized in Jones, "a bare assertion of the requirement of keeping [] detainees . . . will not suffice" to rebut the presumption of punitiveness. Id.

Having raised an unrebutted presumption of punitiveness, Plaintiffs successfully plead a substantive due process claim. But they also satisfy Jones's alternative test by sufficiently alleging that the restrictions are "employed to achieve objectives that could be accomplished in so many alternative and less harsh methods." Jones, 393 F.3d at 932 (quoting Hallstrom v. City of Garden City, 991 F.2d 1473, 1484 (9th Cir. 1993)). Plaintiffs argue that the conditions at Adelanto are in excess of restrictions in the PBNDS, (FAC at 27 n.6 (incorporating by reference the PBNDS)), which offer an example of less restrictive alternative measures. Compare 2011 PBNDS at 386, with (FAC ¶¶ 32-36, 44, 88-92, 93-98, 100-06). These allegations, too, are sufficient to state a claim that the conditions at Adelanto are unduly restrictive in violation of due process.

Federal Defendants' motion to dismiss individual Plaintiffs' substantive due process claim is DENIED. GEO's motion to dismiss this claim is GRANTED with respect to Nsinano's injunctive claim and DENIED in all other respects.

//

---

### 5. Organizational Plaintiffs' First Amendment Claim (Fourth Cause of Action)

Organizational Plaintiffs claim their employee or member attorneys' rights to freedom of speech, expression, and association are violated by the conditions at Defendants' facilities, which limit and deter them from meeting clients and deprive them of means of communication. (FAC ¶¶ 199-203.)

Federal Defendants move to dismiss this claim, because restrictions on communications with detained clients are subject to rational basis review, and if the restrictions are reasonable, the First Amendment is not violated. (DHS Mot. at 34.) To bolster this argument, they reference Bell v. Wolfish, 441 U.S. 520 at 550-51 (1979). Bell concluded that a restriction on prisoners' receipt of hardback books did not unlawfully restrict their First Amendment right as the ban operated in a content-neutral fashion. Id. Bell is not applicable to the attorney organizations' First Amendment claim. The case stands generally for the rule that the constitutional rights of prisoners may be limited pursuant to legitimate institutional goals and objectives, including order and security. 441 U.S. at 546-57. However, Bell did not touch on the First Amendment rights of attorneys vis-à-vis potential or actual clients. The restrictions alleged in the FAC clearly implicate the rights of the non-detained as well. Moreover, individual Plaintiffs are in immigration detention, not criminal pretrial detention or prison.

GEO, in turn, argues that organizational Plaintiffs do not establish a right to communicate with potential or actual clients who are detained, because precedent upon which they rely only deals with lawyers' rights in other (non-detention) contexts. (GEO Mot. at 22 (critiquing the FAC's citation of Legal Services Corp. v. Velazquez, 531 U.S. 533 (2001); In re Primus, 436 U.S. 412 (1978); Nat'l Ass'n for Advancement of Colored People v. Button, 371 U.S. 415 (1963)).

Plaintiffs respond that authority cited in the FAC as well as other authority establish the contours of the First Amendment right at issue: to speak with someone if they may need legal assistance. (Opp. DHS Mot. at 30 (also citing Holder v. Humanitarian Law Project, 561 U.S. 1, 27-28, 38 (2010); Procunier v. Martinez, 416 U.S. 396, 408-09 (1974), overruled by Thornburgh v. Abbott, 490 U.S. 401 (1989).) In addition, Plaintiffs argue that content-neutral restrictions such as those alleged are subject to intermediate scrutiny, Mothershed v. Justices of Supreme Court, 410 F.3d 602, 610 (9th Cir. 2005); Honolulu Weekly, Inc. v. Harris, 298 F.3d 1037, 1043 (9th Cir. 2002). In Mothershed, the Ninth Circuit held that Arizona could impose time, place, and manner restrictions on the First Amendment right to consult with an attorney, so long as the restrictions were "reasonable." 410 F.3d at 611. The court deemed the restrictions reasonable if they were "justified without reference to [content], . . . [were] narrowly tailored to serve a significant governmental interest, and . . . [left] open ample alternative channels for communication of the information." Id. (quoting Kuba v. 1–A Agric. Ass'n, 387 F.3d 850, 858 (9th Cir.2004)).

In their Reply, Defendants add an argument that because detention centers are nonpublic fora, any governmental decision regarding access to the facility need only be reasonable and viewpoint neutral. (DHS Reply at 16.) The Court need not consider arguments raised for the

first time in the Reply.  See Zango, Inc. v. Kaspersky Lab, Inc., 568 F.3d 1169, 1177 n.8 (9th Cir. 2009) ("[A]rguments not raised by a party in an opening brief are waived.").  The Court nonetheless observes that the time, place, and manner precedent cited by Federal Defendants focus on physical access to government facilities by members of the general public engaging in expressive acts like speech and protest.[12]  But these cases are inapposite, because the attorney organizations are claiming a right to associative conduct with their clients and potential clients via telephone and mail, as well as through physical access to private meeting spaces.

The Court therefore applies the intermediate scrutiny standard in Mothershed, 410 F.3d at 611, and concludes that Plaintiffs' allegations are sufficient to state a First Amendment violation.  Plaintiffs allege that Defendants' policies on attorney consultation and communication are more restrictive than the PBNDS on attorney visitation and telephone requests, (FAC ¶¶ 96, 97, 101, 108, 120).  As a result, the FAC alleges less restrictive alternative policies.  Second, Plaintiffs allege restrictions on visitation, legal mail, as well as on attorney calls, and so sufficiently plead a lack of alternate means of communication.  (FAC ¶¶ 6, 13, 37, 38, 41, 51, 54 130-35 (mentioning restrictions on email, mail, visitation, and telephones).)

Defendants' motion to dismiss organizational Plaintiffs' First Amendment claim is DENIED.

### 6.  Individual Plaintiffs' First Amendment Claim (Fifth Cause of Action)

Individual Plaintiffs also claim their First Amendment right to communicate with the outside world—including to make calls, send letters, and receive visitors—and their rights to hire

---

[12] Defendants do not identify any precedent applying this line of First Amendment cases to uphold restrictions on attorney access to detainees by remote means such as telephone and mail.  Furthermore, there is a history of prisons and jails permitting access for attorney consultations, and for other purposes such as family visitation.  In this respect, detention center visitation rooms, if not detention centers generally, are more akin to a limited than a nonpublic forum.

For First Amendment purposes, "limited public fora" are property limited to use by certain groups or dedicated solely to discussion of certain subjects.  Reza v. Pearce, 806 F.3d 497 (9th Cir. 2015) (referencing Pleasant Grove City, Utah v. Summum, 555 U.S. 460, 470 (2009)).  Restrictions on expressive conduct in such places must be viewpoint neutral and reasonable "in light of the purpose being served by the forum" taking into account "whether the restrictions imposed leave open alternative channels of communication."  Id. at 504.  This standard approximates the intermediate scrutiny Plaintiffs argue should apply under Mothershed.  In addition, the nature of the forum here, detention center visitation areas, is historically compatible with the type of association—private attorney consultations—in which Plaintiffs allege they could not engage.

---

**CIVIL MINUTES—GENERAL**          Deputy Clerk MG

and consult with an attorney and receive sealed legal mail,[13] are infringed by overly-restrictive conditions of confinement. (FAC ¶¶ 204-10.) Federal Defendants argue Plaintiffs fail to allege an outright ban on communication and fail to allege the conditions are unreasonable or unrelated to a legitimate government interest. (DHS Mot. at 23 (citing Valdez v. Rosenbaum, 302 F.3d 1039, 1049 (9th Cir. 2002)).)

Valdez defines the contours of the constitutional right as "the right to communicate with persons outside prison walls" and notes that "[u]se of a telephone provides a means of exercising this right." 302 F.3d at 1048. Valdez then applies the "reasonableness" test from Turner v. Safley, 482 U.S. at 89, to the alleged restrictions. This test requires that limits on constitutional rights of prisoners be "reasonably related to legitimate penological interests." Id. The second and fourth Turner factors are whether "there are alternative means" of exercising the right and whether "there are obvious, easy alternatives to the restriction showing it is an exaggerated response to prison conditions." Turner, 482 U.S. at 89-90. Presumably these are the factors the government believes require an allegation of an outright communication ban. The first and third Turner factors are whether there is a rational connection between the restrictions and the government interest put forward, and whether providing the accommodations requested would have a negative impact on the facility and on the allocation of resources. Id.; Valdez, 302 F.3d at 1049.

Applying the Turner factors, the Court concludes Plaintiffs have sufficiently alleged unreasonable restrictions on their right to communicate with the outside world. With regard to the second factor, alternate means, Plaintiffs allege widespread restrictions not only to telephone use and access but to their ability to communicate by other methods, including by email, (FAC ¶ 6), mail, (id. ¶¶ 6, 13, 37, 38, 51, 130-35) and in-person legal visits, (id. ¶¶ 6, 13, 41, 54). They claim these restrictions further hinder their ability to contact non-attorney outsiders, including courts, potential experts, and relatives. (Id. ¶¶ 15, 93-119) .

With regard to the fourth factor, a lack of obvious alternatives suggesting an exaggerated response by the facility, Plaintiffs sufficiently allege that the PBNDS provide less restrictive policies that would allow them to exercise their communication rights and would also satisfy legitimate government interests in order and security.

Taking the first and third Turner factors next, the Court discerns only a weak connection between the alleged restrictions and legitimate security concerns. Nothing on the face of the FAC that suggests the requested relief, or less restrictive alternatives suggested by Plaintiffs, would negatively impact Defendants. As a result, Plaintiffs have successfully plead a violation of the right recognized in Valdez to communicate with the outside world.

Plaintiffs also claim their right to hire and consult an attorney has been violated, and argue that burdens on this right are subject to intermediate scrutiny. (Opp. DHS Mot. at 29 (citing

---

[13] Plaintiffs state they are no longer pursuing a theory under the Petition Clause. (Opp. DHS Mot. at 28 n.13.)

Mothershed, 410 F.3d at 611; DeLoach, 922 F.2d at 620).)  Defendants do not contest the sufficiency of Plaintiffs' allegations as to the right to hire and consult an attorney or the right to receive sealed  legal mail.  As a result, the Court does not consider whether the First Amendment claims under these alternate theories fail.

Federal Defendants' motion to dismiss individual Plaintiffs' First Amendment claim is DENIED.  GEO's motion to dismiss this claim is GRANTED with respect to Nsinano's injunctive claim and DENIED in all other respects.

### 7.      APA Claim (Sixth Cause of Action)

Finally, Plaintiffs claim that Federal Defendants violate the Administrative Procedure Act ("APA") by failing to follow their own rules in the PBNDS.  (FAC ¶¶ 211-215.)  As an alternate APA violation, Plaintiffs claim Federal Defendants are not acting "in accordance with law," by violating attorney access requirements in the INA and Constitution.  (Id.)

The APA provides for judicial review of final agency actions.  5 U.S.C. §§ 702, 706.  A reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ."  5 U.S.C. § 706(2)(A).  An agency's failure to comply with its own procedures is "arbitrary, capricious" conduct violating the APA.  Id.; United States ex. rel. Accardi v. Shaughnessy, 347 U.S. 260, 267 (1954); see also Morton v. Ruiz, 415 U.S. 199, 235 (1974) (applying Accardi to an internal IRS manual, and holding the APA requires agencies to follow internal procedures even when the procedures are "more rigorous than otherwise would be required."); Alcaraz v. INS, 348 F.3d 1150, 1162 (9th Cir. 2004) (recognizing Accardi extends beyond formal regulations).

Two conditions must be satisfied for an agency action to be "final."  First, the action must mark the "consummation" of the agency's decision-making process.  Second, the action must be one by which rights and obligations have been determined or from which legal consequences flow.  Bennett v. Spear, 520 U.S. 154, 177–78 (1997).  Defendants dispute only the first requirement for final agency action, (DHS Mot. at 36).  The Court assumes that the rights of detainees and obligations of detention contract facilities would flow from any agency action regarding detention standards compliance and enforcement.

Taken as true, Plaintiffs' allegations state a final agency action by ICE that implicates the doctrine in Accardi  that it is incumbent upon agencies to follow their own rules.  One final agency action alleged is non-compliance with the PBNDS.  The action is evident from Plaintiffs' incorporation of a DHS Office of the Inspector General (OIG) report.  After examining this report, in combination with allegations within the four corners of the FAC, the Court infers an allegation that ICE was and is engaged in numerous agency decision-making processes regarding PBNDS enforcement and compliance at Adelanto.  (FAC ¶ 169 (citing DHS Office of the Inspector General, Management Alert—Issues Requiring Action at the Adelanto ICE Processing Center in Adelanto, CA, OIG-18-86 at 9 (Sept. 27, 2018) ("OIG Report").)

The Court concludes there is a final agency decision based on three factual allegations. First, the OIG's 2018 "unannounced visit" to Adelanto "identified serious violations [of the PBNDS]," and made several recommendations on how to bring the facility into compliance. OIG Report at 2. ICE replied to the recommendations by noting it "ha[d] scheduled a contractor to inspect the Adelanto ICE Processing Center, beginning October 10, 2018" and that the "inspection [was] intended to gauge compliance with the 2011 PBNDS." OIG Report at 12. Second, ICE noted it would undertake an additional "Special Assessment Review" in specific response to the OIG's alert, implying that the first contracted inspection was routine and had been scheduled before the alert. Id. ICE stated the actions would be completed by January 31, 2019. Id. Finally, although the actions would not have been final at the time the action began, the OIG "reviewed documentation from previous ICE inspections." Id. at 10.

From these three references to ongoing and past agency inspections of Adelanto, the Court finds an allegation that ICE regularly initiates and concludes PBNDS-compliance reviews. Because Plaintiffs allege that the PBNDS are contractually binding, the Court determines that any past or ongoing non-compliance at Adelanto is allegedly the result of an agency decision not to enforce the terms of its contract. As a result, Plaintiffs have sufficiently alleged a final agency action. And because they point to conditions at Adelanto falling well below the PBNDS minimum, they state an APA violation. Compare 2011 PBNDS at 386, with (FAC ¶¶ 32-36, 44, 88-92, 93-98, 100-06).

Federal Defendants' motion to dismiss the APA claim is therefore DENIED.

## IV.    CONCLUSION

Based on the foregoing, the Court DENIES Federal Defendants' motion to dismiss. The Court GRANTS GEO's motion to dismiss Plaintiff Nsinano's injunctive claims and DENIES GEO's motion to dismiss in all other respects.

**IT IS SO ORDERED.**